UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

CATALYST ADVISORS, L.P.,

                              Plaintiff,

                -v.-

CATALYST ADVISORS INVESTORS
GLOBAL INC. ("CAIG") and CHRISTOS
RICHARDS,

                              Defendants.

———————————————————————

21 Civ. 4855 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Catalyst Advisors, L.P. ("Catalyst," or the "Company"), an international executive recruitment firm, filed suit against two of its former partners, Catalyst Advisors Investors Global Inc. ("CAIG") and Christos Richards (together, "Defendants"), for allegedly appropriating Plaintiff's proprietary information and then exploiting it to unfairly compete with Plaintiff. For this conduct, Plaintiff asserts claims for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831-1839, common-law misappropriation of trade secrets, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff has failed to establish the elements of its only federal claim under the DTSA and that the Court should decline to exercise supplemental jurisdiction over the remaining state-law claims. For the

reasons outlined in the remainder of this Opinion, the Court grants in part and denies in part Defendants' motion to dismiss.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Business and Trade Secrets

Plaintiff is a Delaware limited partnership with its principal place of business in New York. (Am. Compl. ¶ 13). Plaintiff operates as an international executive recruitment firm that specializes in the placement of board members, CEOs, and other "C-suite" level positions in the biopharmaceutical and life sciences industry. (*Id.* at ¶ 14). Plaintiff explains that in the ordinary course of its business, it creates and maintains "confidential and proprietary" information, which includes: "resumes, curricul[a] vitae, proposal letters, contracts, progress reports, firm brochures, notes from client update calls and discussions with candidates, marketing materials, references, and other Catalyst internal documents" (together, "Catalyst IP"). (*Id.* at ¶ 38). Within the broad category of Catalyst IP is personalized information and analytics specific to each executive candidate

---

[1]    This Opinion draws its facts from the Amended Complaint ("Am. Compl." (Dkt. #17)), the well-pleaded allegations of which are taken as true on this motion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies on the copy of the Amended Limited Partnership Agreement governing the parties' relationship, which agreement is incorporated by reference in the Complaint and included as an exhibit to the Declaration of Lainie E. Cohen in support of Defendants' motion to dismiss ("Cohen Decl., Ex. B," or the "LPA" (Dkt. #25)).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #24); Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #29); and Defendants' reply memorandum of law as "Def. Reply" (Dkt. #30).

that Plaintiff was hired to assess and recruit on behalf of its clients.  (*Id.* at ¶ 39).  Plaintiff expended hundreds of hours developing Catalyst IP, which included interviewing candidates and assessing their fit and eligibility for various roles that their clients sought to fill.  (*Id.* at ¶¶ 40, 90).  These information-gathering efforts allowed Plaintiff to garner institutional knowledge that endowed Plaintiff with a competitive advantage in the recruiting industry.  (*Id.* at ¶ 40).

One specific component of Catalyst IP identified by Plaintiff in the Amended Complaint is its list of candidates, which list includes the names, current employers, titles, and contact information of more than 1,100 Chief Medical Officers and physician executives in the pharmaceutical industry around the world (the "Candidate List").  (Am. Compl. ¶ 89).  In developing the Candidate List, Plaintiff spent hundreds of hours and thousands of dollars in data subscription fees.  (*Id.* at ¶ 90).  The Candidate List contains information that is not publicly available and that is valuable to anyone conducting executive searches in the field of biopharmaceuticals.  (*Id.* at ¶ 93).  This compilation of detailed information on specialized professionals attracts clients to Plaintiff's services.  (*Id.* at ¶¶ 90, 94).

Plaintiff took several measures to protect Catalyst IP.  (Am. Compl. ¶ 41).  *First,* Plaintiff stored Catalyst IP in the Company's internal database (Invenias) and its file system (Sharepoint), which are accessible only to employees with an authorized username and password.  (*Id.* at ¶ 41(a)).  These databases are controlled internally and are not readily ascertainable or disclosed outside of

the Company.  (*Id.* at ¶ 42).  *Second*, Plaintiff required all partners to execute the LPA, which contains confidentiality, non-compete, and non-solicitation provisions that cabin a partner's dissemination and use of confidential and proprietary information.  (*Id.* at ¶¶ 28-29, 41(b)).  *Third*, Plaintiff restricted access to Catalyst IP to partners and employees with reason to access such information, provided such individuals first executed the LPA.  (*Id.* at ¶ 41(c)).

### 2.   Defendants' Partnership Roles with Plaintiff and the Amended Limited Partnership Agreement

Defendants are erstwhile partners of Catalyst.  CAIG is a Delaware corporation, controlled and operated by its indirect controlling shareholder, Simon Bartholomew.  (Am. Compl. ¶¶ 15-18, 22).[2]  Christos Richards is a resident of Hermosa Beach, California.  (*Id.* at ¶ 19).

In or around November 2013, Defendants approached Plaintiff's founder and managing partner about joining the Company as partners.  (Am. Compl. ¶¶ 23-24).  Defendants jointly negotiated the terms of their partnership roles with Plaintiff and secured equal voting rights under the LPA.  (*Id.* at ¶ 24). CAIG, acting at all relevant times through Bartholomew, served as a partner at the Company from February 2014 through October 21, 2019.  (*Id.* at ¶¶ 21-22). Richards served as a partner at the Company from January 2014 through October 4, 2019.  (*Id.* at ¶ 20).

---

[2]      CAIG's sole shareholder is a British company, Bartholomew Advisors.  (Am. Compl. ¶ 16).  Bartholomew Advisors is, in turn, controlled by Simon Bartholomew, who is the majority shareholder and owns at least 95% of the company's voting rights.  (*Id.* at ¶ 17).  Plaintiff alleges that Bartholomew formed Bartholomew Advisors and CAIG to serve as his alter egos as a partner of the Company.  (*Id.* at ¶¶ 18, 22).

Prior to assuming their roles as partners in 2014, Defendants executed a limited partnership agreement, which was subsequently amended in 2018. (Am. Compl. ¶¶ 25-26).  As relevant to this case, the LPA contains a confidentiality provision, a non-compete provision, and a non-solicitation provision.

*First*, the LPA's confidentiality provision calls for each partner to acknowledge that he or she may "receive confidential and proprietary information relating to the Company, including information relating to the Company's financial condition, prospects, business plans, and intellectual property and that the disclosure of such confidential information to a third party would cause irreparable injury to the Company."  (LPA § 5.9(a)).[3]  The confidentiality provision goes on to provide that "[e]xcept with the prior written consent of the [Operating] Committee, a Partner shall not disclose any such information to a third party (other than on a 'need to know' basis to a Partner's Affiliate or Representative (each of whom must have agreed, before such disclosure, to maintain the confidentiality of such information))."  (*Id.*).  A partner who discloses confidential information "will be liable to the Company for damages arising out of any such disclosure to or by such third parties." (*Id.*).  Lastly, the confidentiality provision obligates each partner to "use reasonable efforts to preserve the confidentiality of such information."  (*Id.*).  A

---

[3]     The LPA defines "intellectual property" as "inventions, technology, software, databases, audio-visual works, designs, systems, trademarks, service marks, slogans, logos, information, trade secrets, processes, materials, methods, works of authorship or design, methods of improvements, or portions of any such material[.]"  (LPA § 5.8).

partner's restrictions pursuant to the confidentiality provision "survive until the third anniversary of the date the Partner is no longer a Partner." (*Id.*).

*Second*, the LPA's non-compete provision restricts active partners of the Company from directly or indirectly (i) "interfer[ing] with, divert[ing], or otherwise seek[ing] to terminate or cause to be terminated, the relationship of the Company with any Company Customer"; or (ii) "provid[ing] services to any person that provides services in competition with the services provided by the Company." (LPA § 5.6).

The third and final provision of the LPA bearing on this dispute is the non-solicitation provision, which is statedly geared toward "protect[ing] [the] Company's legitimate trade secrets." (LPA § 5.7).  Under this provision, at all times during a partner's tenure and for one year following:

> a Partner shall not, ... : [i] hire, solicit, or encourage to leave, any Partner, employee, independent contractor or vendor of the Company; [ii] provide the name of any Partner, employee, independent contractor or vendor of the Company to any recruiting agency, contract consulting firm, or any other person for the purpose of enabling or assisting said person to obtain employment or provide services for a third person for any reason; [iii] hire, retain, or contract for the services of any Partner, employee, independent contractor or vendor of the Company except under a written agreement with the Company; or [iv] use any information provided by the Company pertaining to the Company's Partners, employees, independent contractors or vendors for any purpose other than for the purpose for which it was disclosed.

(*Id.*).

### 3.    Defendants' Departures from Catalyst and Use of Plaintiff's Information

According to Plaintiff, the events giving rise to this suit stem from CAIG's and Richards's plans to unfairly compete against Plaintiff both during and following their time as partners at the Company.  (Am. Compl. ¶¶ 31, 110-112). Plaintiff alleges that prior to leaving the Company, Defendants improperly obtained copies of Plaintiff's internal documents and used them to further their competing business interests.  (*See id.* at ¶¶ 44, 88).  Plaintiff asserts distinct allegations regarding each Defendant's conduct and the Court accordingly will discuss the allegations seriatim.

### a.    Richards's Departure

Richards began contemplating his departure from the Company in or around the beginning of 2019.  (Am. Compl. ¶ 43).  Unbeknownst to Plaintiff at the time, in preparation for his departure, Richards accessed, copied, and transferred Catalyst IP to his personal devices.  (*Id.* at ¶ 44).  Hoping to cover his tracks, Richards attended a mandatory partner meeting in New York on or around August 8, 2019, at which time he sought to exchange his work-issued laptop by fabricating a claim that it was not functional.  (*Id.* at ¶¶ 45-49). Richards expected that Plaintiff would respond to his request by following its typical practice of wiping returned laptops of their memory and data, effectively concealing any trace of his personal downloads of Catalyst IP.  (*Id.* at ¶ 47). Several months later, on October 4, 2019, Richards resigned from the Company without advance notice.  (*Id.* at ¶ 50).  The day after his resignation,

Richards accessed additional internal company documents, which he downloaded to his personal storage devices.  (*Id.* at ¶ 51).

Richards then began to work for one of Plaintiff's competitors, where his misappropriation of Plaintiff's information has benefitted his new employer at Plaintiff's expense.  (Am. Compl. ¶¶ 52-54).  As an example of the resultant harm to the Company, Plaintiff alleges that while still working at the Company, Richards induced one of Plaintiff's potential clients to close an open proposal (*i.e.*, a new business lead involving a client who had not yet signed a proposal letter), only for that potential client to reopen the same search project with Richards's new employer.  (*Id.* at ¶¶ 55-61).  In addition, while still a partner at the Company, Richards prompted another client, who had formally engaged Plaintiff's services, to cancel a project with Plaintiff and pay fees to Richards's new employer that were owed to Plaintiff.  (*Id.* at ¶¶ 62-66).  Richards also caused another of Plaintiff's potential clients to refrain from conducting its board search with Plaintiff, so that he could lure that client to his new employer.  (*Id.* at ¶¶ 67-71).

### b.    CAIG's Departure

CAIG, acting through Bartholomew, began planning its separation from the Company as early as December 2018.  (Am. Compl. ¶ 72).  While still a partner at the Company, CAIG actively competed with Plaintiff by referring business to Bartholomew Advisors, a competing search company controlled by Bartholomew.  (*Id.* at ¶¶ 73-75).  CAIG also used Catalyst IP and resources to complete a search for at least one client on behalf of Bartholomew Advisors.

(*Id.* at ¶¶ 75-81).  In addition, CAIG purposely failed to input valuable information that it gleaned from client projects into Plaintiff's database, and affirmatively deleted certain client information before resigning, all to prevent Plaintiff from benefitting from its work.  (*Id.* at ¶ 108).

Beyond directly competing with Plaintiff, CAIG also hired two research contractors away from Plaintiff (Am. Compl. ¶¶ 106-107) and appropriated Plaintiff's proprietary information for the benefit of Bartholomew Advisors (*id.* at ¶¶ 83-85).  CAIG did so by making hard copies of Catalyst IP, which it subsequently photographed, scanned, and copied.  (*Id.* at ¶¶ 84-87).  It also downloaded and forwarded Catalyst IP to third parties, including Bartholomew's wife and an external research contractor.  (*Id.* at ¶ 104). Moreover, on the date CAIG resigned, it obtained the Candidate List by having its research assistant email the document to Bartholomew's executive assistant after mislabeling it as a client proposal.  (*Id.* at ¶¶ 89, 92).  Bartholomew then printed out the Candidate List and took it with him after his resignation.  (*Id.* at ¶ 95).  CAIG has continued to use the information contained in the Candidate List to unfairly compete with Plaintiff.  (*Id.* at ¶¶ 99, 103).

## B.   Procedural Background

Plaintiff commenced this lawsuit with the filing of the underlying complaint on June 1, 2021.  (Dkt. #1).  The following month, on July 21, 2021, Defendants filed a pre-motion letter indicating their intent to move to dismiss the complaint.  (Dkt. #14).  Plaintiff filed a responsive letter on July 26, 2021. (Dkt. #15).  The Court dispensed with its typical requirement that the parties

attend a pre-motion conference in favor of setting a briefing schedule for Defendants' motion that included an opportunity for Plaintiff to amend its pleadings.  (Dkt. #16).

Plaintiff filed the Amended Complaint on August 19, 2021.  (Dkt. #17). Thereafter, Defendants filed their motion to dismiss and supporting papers on September 23, 2021.  (Dkt. #22).[4]  On October 12, 2021, Plaintiff filed a letter seeking the Court's leave to proceed with discovery during the pendency of Defendants' motion to dismiss (Dkt. #26), to which Defendants responded the following day (Dkt. #27).  The Court denied this motion on October 18, 2021. (Dkt. #28).  Three days later, Plaintiff filed its memorandum of law in opposition to Defendants' motion to dismiss.  (Dkt. #29).  Defendants filed their reply brief on November 4, 2021.  (Dkt. #30).  Accordingly, Defendants' motion to dismiss is fully briefed and ripe for the Court's consideration.

## DISCUSSION

Plaintiff asserts five claims against Defendants, only one of which — the DTSA claim — arises under federal law.  In moving to dismiss the Amended Complaint in its entirety, Defendants contend that Plaintiff has failed to plead this federal cause of action adequately, and that without the hook of a federal claim, the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.  (Def. Br. 1-2).  In resolving Defendants' motion, the Court first addresses the appropriate legal standard under Rule

---

[4]     Due to a docketing error, Defendants refiled their moving papers on September 30, 2021.  (Dkt. #23-25).

12(b)(6), before proceeding to assess Plaintiff's trade secrets claims.  Because the Court finds that Plaintiff has stated a federal claim for violation of the DTSA, the Court will exercise supplemental jurisdiction over Plaintiff's pendent state-law claims.

## A.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This narrow universe includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted). On this motion, the Court may consider the copy of the LPA attached as Exhibit B to the Declaration of Lainie Cohen, as it is incorporated by reference in and integral to the Amended Complaint. *See Goel*, 820 F.3d at 559 (explaining that "[a] document is integral to the complaint 'where the complaint relies heavily upon its terms and effect,'" which often involves "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls").

## B.  Plaintiff Has Stated Claims for Trade Secret Misappropriation Under the DTSA and New York Common Law

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that [i] it possessed a trade secret, and [ii] the defendant misappropriated the trade secret." *Inv. Sci., LLC* v. *Oath Holdings Inc.*, No. 20 Civ. 8159 (GBD), 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021) (citation omitted); *see also* 18 U.S.C. § 1836(b)(1). Similarly, under New York common law, "[a] plaintiff claiming misappropriation of a trade secret must prove: [i] it possessed a trade secret, and [ii] defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Zabit* v. *Brandometry, LLC*, 540 F. Supp. 3d 412, 421 (S.D.N.Y. 2021) (quoting *Integrated Cash Mgmt. Servs., Inc.* v. *Digit.*

12

*Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)).  Because "[t]he elements

for a misappropriation claim under New York law are fundamentally the same"

as a DTSA claim, "courts have found that a '[c]omplaint sufficiently plead[ing] a

DTSA claim ... also states a claim for misappropriation of trade secrets under

New York law.'"  *Iacovacci* v. *Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380

(S.D.N.Y. 2020) (quoting *ExpertConnect, L.L.C.* v. *Fowler*, No. 18 Civ. 4828

(LGS), 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019)).

### 1.  Possession of Trade Secrets

Defendants first attack Plaintiff's federal and state trade secret claims on

the grounds that Plaintiff has failed to allege the existence of a trade secret.

(Def. Br. 8-16).  Plaintiff retorts that the category of information defined as

Catalyst IP warrants trade secret protection.  (Pl. Opp. 8-19).

The DTSA defines "trade secret" to include "all forms and types of

financial, business, scientific, technical, economic, or engineering information"

so long as (i) the owner "has taken reasonable measures to keep such

information secret" and (ii) "the information derives independent economic

value, actual or potential, from" its secrecy.  18 U.S.C. § 1839(3).  New York

courts generally apply the six-factor test outlined in the *Restatement (First) of

Torts* to determine whether information constitutes a trade secret under either

the DTSA or state law, considering:

> [i] the extent to which the information is known outside
> of the business; [ii] the extent to which it is known by
> employees and others involved in the business; [iii] the
> extent of measures taken by the business to guard the
> secrecy of the information; [iv] the value of the
> information to the business and to its competitors;

> [v] the amount of effort or money expended by the
> business in developing the information; [and] [vi] the
> ease or difficulty with which the information could be
> properly acquired or duplicated by others.

*Iacovacci*, 437 F. Supp. 3d at 380.  These factors reflect the understanding that

the "most important consideration" in determining whether information is a

trade secret is "whether the information was secret."  *See Zabit*, 540 F. Supp.

3d at 421 (quoting *Broker Genius, Inc.* v. *Zalta*, 280 F. Supp. 3d 495, 514

(S.D.N.Y. 2017)); *see also Ashland Mgmt.* v. *Janien*, 82 N.Y.2d 395, 407 (1993)

("[A] trade secret must first of all be secret.").  Though the question of whether

proprietary information qualifies as a trade secret is ordinarily a question of

fact not resolvable on a motion to dismiss, courts dismiss claims involving

trade secrets where it is clear that the information at issue is not actually

secret or there is no discernible economic value from that information not being

generally known.  *Zirvi* v. *Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y 2020); *see*

*also ExpertConnect*, 2019 WL 3004161, at *5.

  "Naturally, a DTSA plaintiff 'has no obligation to reveal [its] secrets in the

[c]omplaint simply to prove that they exist.'"  *TRB Acquisitions LLC* v. *Yedid*,

No. 20 Civ. 552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021)

(quoting *Island Intell. Prop., LLC* v. *StoneCastle Asset Mgmt. LLC*, 463 F. Supp.

3d 490, 500 (S.D.N.Y. 2020)).  "But that does not mean a party can get away

with nebulous descriptions at the highest level of generality."  *Id.* (quoting *Ad*

*Lightning Inc.* v. *Clean.io, Inc.*, No. 19 Civ. 7367 (JPO), 2020 WL 4570047, at *2

(S.D.N.Y. Aug. 7, 2020)); *see also Broker Genius*, 280 F. Supp. 3d at 515

("While neither the New York Court of Appeals nor the United States Court of

Appeals for the Second Circuit has expressly required trade secrets to be identified with any particular degree of specificity, it is evident that a 'vague and indefinite' piece of information cannot be protected as a trade secret."). "Accordingly, although there is no heightened pleading requirement on actions brought under the DTSA, and plaintiffs are not required to plead each of the six factors generally considered under New York law, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Zabit*, 540 F. Supp. 3d at 422 (internal quotation marks, citations, and alterations omitted); *see also Broker Genius*, 280 F. Supp. 3d at 514-15 (collecting cases).

### a. Accessibility of Catalyst IP

Plaintiff alleges that the Catalyst IP — defined to include "resumes, curricul[a] vitae, proposal letters, contracts, progress reports, firm brochures, notes from client update calls and discussions with candidates, marketing materials, references, and other Catalyst internal documents," as well as the names, current employers, titles, and contact information of more than 1,100 Chief Medical Officers and physician executives contained in the Candidate List (Am. Compl. ¶¶ 38-42, 89) — constitutes protectible trade secrets. Defendants assert to the contrary, arguing in heavy reliance on the recent decision in *24 Seven* v. *Martinez*, No. 19 Civ. 7320 (VSB), 2021 WL 276654 (S.D.N.Y. Jan. 26, 2021), in which a sister court in this District granted a motion to dismiss on the grounds that the information a placement agency sought to protect did not

15

satisfy the definition of a trade secret.  (*See* Def. Br. 9; Def. Reply 4-5).  The
Court finds this case distinguishable.

At issue in *24 Seven* was the trade secret status of four primary
categories of a staffing agency's information: (i) client and candidate names and
contacts; (ii) insight into particular clients' preferences; (iii) information about
pricing and profit margins; and (iv) employee training materials.  *24 Seven*,
2021 WL 276654, at *6, 9.  In concluding that this information did not merit
trade secret protection, Judge Broderick noted that the staffing agency's clients
were large global companies that did not exclusively engage plaintiff for its
staffing needs and that plaintiff's candidates were motivated to disseminate
their information broadly to widen their recruiting net.  *Id.* at *7.  Because the
identities of the staffing agency's clients and candidates were "readily
obtainable in the industry," they could not constitute a trade secret.  *Id.*  That
the plaintiff had expended resources on recruiters, job fairs, advertising, and
industry events to obtain its customers' hiring preferences and contact
information only highlighted the fact that the information was readily available
to others in the industry.  *Id.*

Plaintiff convincingly differentiates the information at issue in the instant
matter.  For one, while the plaintiff in *24 Seven* was a generalized staffing
agency, Plaintiff operates in a niche industry, specializing in recruiting board
members and executives for biopharmaceutical companies.  (Pl. Opp. 12).
Beyond lists of client and candidate names, Plaintiff alleges that its trade
secrets include "detailed and personalized information and analytics specific to

16

each executive candidate that Catalyst was hired to assess and recruit." (Am. Compl. ¶ 39). Albeit vaguely, Plaintiff makes the important clarification that due to the nature of its business as an executive search firm, rather than a generalized staffing agency, not all of the candidates with whom it works are actively looking for new employment. (Pl. Opp. 13). For this reason, obtaining candidate information entails more than just perusing the internet. (*Id.*). Rather, Plaintiff must actively cultivate and develop relationships with individuals whose information is not widely disseminated or otherwise accessible. (*Id.*; *see also* Am. Compl. ¶¶ 40, 90). Precisely because a candidate's fit for an open leadership position may not be "readily ascertainable," clients are drawn to Plaintiff because of the resources it expends to acquire Catalyst IP. (Am. Compl. ¶ 94). On these allegations, Catalyst IP gives Plaintiff a competitive advantage in the industry (*id.* at ¶¶ 40, 90, 99), which suggests that this information derives "independent economic value … from not being generally known." 18 U.S.C. § 1839(3).[5]

At a later stage in this case, the Court will demand more specificity into the personalized information included under the rubric of Catalyst IP. At the pleading stage, however, Plaintiff has sufficiently identified a category of

---

[5]     Within the framework of the trade-secret test outlined in the *Restatement (First) of Torts*, Plaintiff's allegations on this point bear on five of the six applicable factors, namely (i) the extent to which the information is known outside of the business; (ii) the extent to which it is known by employees; (iv) the value of the information to the business and to its competitors; (v) the amount of effort or money expended by the business in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or duplicated by others. The Court discusses the third factor — measures taken to guard the secrecy of the information at issue — in further detail *infra*.

candidate- and client-specific information that was developed through its own diligence and expenditure of resources and is not known or easily obtainable outside of Plaintiff's business.  *See, e.g., Tesla Wall Sys., LLC* v. *Related Cos., L.P.*, No. 17 Civ. 5966 (JSR), 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017) (finding sufficiently specific description of trade secret as "technical data, internal pricing information, work product, research, [and] engineering designs").[6]

The most specific document over which Plaintiff asserts trade secret protection is the Candidate List.  "[T]he *sine qua non* of whether a customer list constitutes a trade secret lies in whether 'the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products,' or, by contrast, 'the customers are not known in the trade or are discoverable only by extraordinary efforts [and the] customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money.'" *24 Seven*, 2021 WL 276654, at *7 (quoting *Poller* v. *BioScrip, Inc.*, 974 F. Supp. 2d 204, 216 (S.D.N.Y. 2013)).  "Where it 'would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply.'"  *Id.* (quoting *N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 46 (2d Cir. 1999)).  However, lists that contain information about

---

[6]     That said, there are elements of the Catalyst IP that appear unlikely to warrant trade secret status as documents that are not intended by their authors to remain secret — in particular, firm brochures and marketing materials.  That some of the elements of Catalyst IP may not constitute trade secrets does not defeat Plaintiff's pleadings with respect to other materials that do appear to be trade secrets.

customers are not trade secrets if they "are little more than a compilation of publicly available information," such as contact information. *Art & Cook, Inc.* v. *Haber*, 416 F. Supp. 3d 191, 196 (E.D.N.Y. 2017); *see also Town & Country House & Home Serv., Inc.* v. *Newbery*, 3 N.Y.2d 554, 560 (1958) (finding a customer list to be a trade secret under New York law where the "customers had been screened by respondent at considerable effort and expense, without which their receptivity and willingness to do business with this kind of a service organization could not be known").[7]

Plaintiff has sufficiently alleged that its compilation of candidates is deserving of trade secret status. Most importantly on this point, Plaintiff alleges that it poured hundreds of hours into interviewing candidates and evaluating their fit and eligibility for executive positions, along with understanding their various roles in the scientific industry, in developing the list of highly specialized executives. (Am. Compl. ¶¶ 38-40, 90). This fact distinguishes Plaintiff's Candidate List from that in *24 Seven*, which was compiled using information gleaned from investments in recruiters, job fairs, advertising, and industry events. *See 24 Seven*, 2021 WL 276654, at *7. In other words, the Candidate List is not merely the product of Plaintiff's investment in marketable products or attendance at industry events. Rather, Plaintiff gathered the information by developing relationships with industry

---

[7]     The Court acknowledges Defendants' point that there is a line of trade secret cases dealing with client lists, which may be distinct from candidate lists. (Def. Reply 6). The Court believes client and candidate lists to be sufficiently analogous such that the case law analyzing the former applies with equal force to the latter.

executives, conducting personalized interviews of those executives, and performing individualized assessments for particular positions.  Given the legwork Plaintiff claims to have put into identifying the candidates on the Candidate List, many of whom were not actively looking for new employment at the time Plaintiff contacted them, Plaintiff has adequately alleged that this list merits trade secret protection.

> ### b.   Measures Taken by Plaintiff to Guard the Secrecy of Catalyst IP

The DTSA also requires that the owner of a trade secret "take[ ] reasonable measures to keep such information secret."  18 U.S.C. § 1839(3).  Likewise, the *Restatement (First) of Torts* sets forth "the extent of measures taken by the business to guard the secrecy of the information" as one of the factors to consider in evaluating the existence of a trade secret.  Generally speaking, such measures can include "the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality."  *Oath Holdings*, 2021 WL 3541152, at *3 (quoting *Ad Lightning*, 2020 WL 4570047, at *3).

Here, Plaintiff has alleged several interrelated measures that the Court recognizes as reasonably safeguarding the secrecy of Catalyst IP.  Plaintiff alleges that "Catalyst IP is maintained in the Company's internal licensed database, Invenias, and file system, Sharepoint, accessible only to Catalyst employees with an authorized Username and Password."  (Am. Compl. ¶ 41(a)).

Defendants argue that this password cannot reasonably protect Plaintiff's alleged trade secrets because these password-protected systems are equally accessible to all employees.  (Def. Br. 14).  In this regard, Defendants liken Plaintiff's password protection of its database and file system to the login and password needed to access a business email account, which does not constitute a reasonable protective measure because it "fails to differentiate from a protective measure that is used to safeguard any other corporate information."  (*Id.* at 12-13 (quoting *Oath Holdings*, 2021 WL 3541152, at *4)).  But Defendants misconstrue Plaintiff's allegations, which clarify that Catalyst IP is restricted within the Company to "partners/employees with reason to access such information provided that such persons have executed the Amended LPA."  (Am. Compl. ¶ 41(c)).

Relatedly, Plaintiff requires all partners to execute the LPA, which contains a confidentiality provision and a non-solicitation provision aimed at protecting Plaintiff's trade secrets.  (Am. Compl. ¶ 41(b)).  Defendants challenge the applicability of the confidentiality provision to the allegedly misappropriated trade secrets, asserting that its restrictions on disclosures to third parties do not apply to the types of information that compose Catalyst IP, but are limited to "the Company's financial condition, prospects, business plans, and intellectual property."  (Def. Br. 12; *see also* LPA § 5.9(a)).  Not so, as the LPA's definition of "intellectual property" extends to, *inter alia*, "information, trade secrets, processes, materials, methods of works of

authorship or design, methods or improvements, or portions of any such material," which plausibly include Catalyst IP.

These measures are in line with those found by courts to reasonably guard the secrecy of information warranting trade secret protection. *See, e.g.*, *Ad Lightning*, 2020 WL 4570047, at *3 (finding reasonably protective measures "requiring employees and clients to sign non-disclosure agreements" and limiting access to proprietary information "to parties with permission to view such information" after signing contracts with confidentiality provisions); *Syntel Sterling Best Shores Mauritius Ltd.* v. *Trizetto Grp., Inc.*, No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (crediting reasonably protective measures to keep information secret that included "making those who use it subject to confidentiality provisions and limitations, and only making it accessible through strictly controlled servers").

### 2. Misappropriation

Defendants next argue that Plaintiff has failed to allege that they misappropriated any putative trade secret. (Def. Br. 16-18). The Court disagrees.

Under the DTSA, misappropriation is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" in specified circumstances. 18 U.S.C. § 1839(5). As relevant here, misappropriation includes circumstances in which a person "at the time of the disclosure or use, knew or had reason to

22

know that the knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5). Thus, the DTSA provides for "three theories of liability: [i] acquisition, [ii] disclosure, or [iii] use." *Integra USA, Inc.* v. *Grain*, No. 19 Civ 8752 (JPO), 2019 WL 6030100, at *2 (S.D.N.Y. Nov. 14, 2019).

Defendants argue that by virtue of their roles as partners of the Company, they could not have acquired Catalyst IP by improper means. (Def. Br. 16-17). They reason as follows: Even accepting Plaintiff's allegations that Richards sought to hide the fact that he transferred Catalyst IP onto personal storage devices (*see* Am. Compl. ¶¶ 44-49), or that CAIG digitized its hard copies of Catalyst IP (*see id.* at ¶¶ 84-87), Plaintiff has not suggested that Defendants were disallowed from accessing such information or that there was a Company policy that prohibited maintaining or downloading personal copies of Catalyst IP. Defendants' point on the applicability of the "acquisition" theory of misappropriation is well taken; however, misappropriation under the DTSA is not so limited.

Here, Plaintiff has clearly alleged that Defendants used or disclosed trade secrets "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839. Defendants were both partners of the Company who signed an agreement imposing restrictions on their ability to disclose and use Plaintiff's proprietary information. (*See* LPA §§ 5.6, 5.9). Under the LPA's confidentiality provision,

23

partners were expressly prohibited from disclosing Plaintiff's confidential and proprietary information to third parties, while serving as partners and for three years thereafter.  (*Id.*, § 5.9).  And under the LPA's non-compete clause, at all times while employed by the Company, partners were prohibited from interfering with, diverting, or otherwise causing to be terminated Plaintiff's relationship with any of its clients.  (*Id.*, § 5.6).[8]  Plaintiffs allege that Defendants did just that.

For instance, the Amended Complaint alleges that while a partner at the Company, Richards transferred Catalyst IP to his personal storage devices and used such information in aid of his efforts to sabotage Plaintiff's client relationships in favor of his future employer.  (Am. Compl. ¶¶ 43-61, 67-71).  These efforts included drafting a proposal letter for one of Plaintiff's potential clients, only to suggest to that client that the proposal be withdrawn just weeks before Richards's departure.  (*Id.* at ¶¶ 57-59).  On Plaintiff's account, Richards induced this client to withdraw its proposal with Plaintiff and sign a different proposal with Richards's new employer.  (*Id.* at ¶ 60).  This client worked with Richards at his new employer to hire as chief business officer an individual

---

[8]    Plaintiff additionally points to the LPA's non-solicitation provision as imposing additional restrictions on a partner's "use" of Catalyst IP.  (*See* Pl. Opp. 18).  This provision states, in relevant part, that "[t]o protect [the] Company's legitimate trade secrets," partners employed by Plaintiff and for a period of one year following a partner's termination of services, shall not, among other things, "use any information provided by the Company pertaining to the Company's Partners, employees, independent contractors or vendors for any purpose other than for the purpose for which it was disclosed."  (LPA § 5.7).  The Court is skeptical that any of the allegedly misappropriated information falls within the ambit of the non-solicitation provision because the information at issue does not appear to "pertain[ ] to the Company's Partners, employees, independent contractors or vendors[.]"

whom Richards had engaged while working for Plaintiff.  (*Id.* at ¶ 61).  These allegations plausibly suggest that Richards used Catalyst IP to interfere with Plaintiff's client relationships, despite signing a contract that prohibited such conduct.  As such, Plaintiff has adequately pleaded that Richards misappropriated Plaintiff's trade secrets.[9]

For its part, CAIG is alleged to have disclosed Catalyst IP to third parties and used such information to compete with Plaintiff while still a partner at the firm.  More specifically, CAIG allegedly "downloaded and forwarded internal Catalyst documents to third parties, including Bartholomew's wife and an external research contractor," in violation of the LPA's confidentiality provision.  (Am. Compl. ¶ 104).  CAIG is further alleged to have created a target list for a client project based on Catalyst IP, which list Bartholomew forwarded to his personal email account and then used to complete a project on behalf of Bartholomew Advisors.  (*Id.* at ¶¶ 79-82).  With these allegations, Plaintiff has

---

[9]  Defendants argue that Plaintiff cannot plausibly allege misappropriation on a theory of improper "use" because the LPA's confidentiality provision restricts only a partner's ability to *disclose* confidential or proprietary information to third parties.  (Def. Br. 12, 17-18; Def. Reply 7-8).  In other words, because the LPA's confidentiality clause does not contain an express limitation on a partner's use of Catalyst IP, allegations that a Defendant misused confidential information cannot qualify as misappropriation.  Defendants are incorrect.  Although the confidentiality provision does not contain an explicit restriction on how a partner may use Plaintiff's confidential or proprietary information, this provision is not the only source of a partner's obligations with respect to such information.  As but one example, the LPA's non-compete provision prohibits an active partner from impeding Plaintiff's client relationships.

To be clear, the Court's emphasis on Plaintiff's allegations of Richards's misuse of Catalyst IP should not be read to foreclose Plaintiff from arguing at a later stage of the proceedings, and with the benefit of discovery, that Richards also misappropriated Plaintiff's trade secrets by impermissibly disclosing Catalyst IP to third parties.

sufficiently pleaded that CAIG circumvented its duties with respect to Catalyst IP to make out a claim for misappropriation.

*     *     *

In sum, Plaintiff has adequately alleged that Defendants possessed trade secrets belonging to Plaintiff and then misappropriated those trade secrets. Plaintiff has thus stated a claim for misappropriation of trade secrets under the DTSA.  Given their analytical similarity, the Court necessarily concludes that Plaintiff has also stated a New York common-law claim for misappropriation of trade secrets.  *See, e.g., DFO Glob. Performance Com. Ltd. (Nev.)* v. *Nirmel*, No. 20 Civ. 6093 (JPO), 2021 WL 3475596, at *5 (S.D.N.Y. Aug. 6, 2021).

## C.     Certain of Plaintiff's State-Law Claims Are Duplicative of Its Breach of Contract Claim

Because Plaintiff's federal DTSA claim survives Defendants' motion to dismiss, the Court retains supplemental jurisdiction over Plaintiff's pendent state-law claims.  Therefore, the Court next addresses Defendants' argument that Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty are duplicative of its breach of contract claim.  (Def. Br. 20-22; Def. Reply 10).  The Court agrees with Defendants that these claims are duplicative.

### 1.     Breach of the Implied Covenant of Good Faith and Fair Dealing

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."  *Cruz* v. *FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d

26

Cir. 2002)).  "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Id.* (alteration omitted) (quoting *Harris*, 310 F.3d at 81).  "Therefore, when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."  *Id.*; *see also, e.g., Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, 175 F. Supp. 3d 44, 63 (S.D.N.Y. 2016) ("An implied-covenant claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract."); *Marcus* v. *W2007 Grace Acquisition I, Inc.*, 203 F. Supp. 3d 332, 340 (S.D.N.Y. 2016) ("Typically, raising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing where the claims derive from the same set of facts." (internal quotation marks omitted)).

Here, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing relies on the same allegations of breach as its claim for breach of contract.  With respect to its breach of contract claim, Plaintiff asserts that Defendants breached the LPA by: (i) accessing and misappropriating Catalyst IP; (ii) unfairly competing with Plaintiff's business; (iii) soliciting and hiring at least one of Plaintiff's contractors or employees for CAIG's competing business

venture; and (iv) deleting Plaintiff's intellectual property.  (Am. Compl ¶¶ 134-135).  Plaintiff does not specify any additional facts to support its claim for breach of the implied covenant of good faith and fair dealing, mounting only the generalized allegation that "[b]y the conduct alleged above, [Defendants] have materially breached, and continue to materially breach their duty of good faith and fair dealing."  (*Id.* at ¶ 140).

In short, because the Court has sustained Plaintiff's claim for breach of contract, it dismisses as duplicative Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  *See, e.g.*, *The Najjar Grp., LLC* v. *W. 56th Hotel LLC*, No. 14 Civ. 7120 (RA), 2017 WL 819487, at *5 (S.D.N.Y. Mar. 1, 2017) (dismissing an implied-covenant claim under New York law where claim "relies on the same facts as [plaintiff's] claim for breach of contract.); *Negrete* v. *Citibank, N.A.*, 187 F. Supp. 3d 454, 470 (S.D.N.Y. 2016) (dismissing an implied-covenant claim under New York law, where the claim "relies on no facts distinct from the breach of contract claims").

### 2.    Breach of Fiduciary Duty

Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."  *Johnson* v. *Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett* v. *Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)).  Under New York law, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand."  *William Kaufman Org., Ltd.* v. *Graham & James LLP*, 703 N.Y.S.2d 439,

442 (1st Dep't 2000).  Breach of fiduciary duty and breach of contract claims are duplicative where they "are premised upon the same facts and seek the same damages for the alleged conduct."  *N. Shipping Funds I, LLC* v. *Icon Cap. Corp.*, 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013).

Even assuming Plaintiff has alleged sufficient facts to plead the existence of a fiduciary duty between Defendants and Plaintiff by virtue of Defendants' roles as limited partners, Plaintiff's claim for breach of that duty is "based upon the same facts and theories as [its] breach of contract claim."  *Brooks* v. *Key Trust Co. Nat. Ass'n*, 809 N.Y.S.2d 270, 272 (3d Dep't 2006).  For instance, Plaintiff contends that Defendants breached their fiduciary duties "specifically by improperly utilizing Catalyst's Confidential Information to unfairly compete with Catalyst."  (Am. Compl ¶ 146).  Yet, this is precisely the same conduct that forms the basis of Plaintiff's claims for breach of the LPA.  (*See id.* at ¶ 135 (alleging that Defendants "breached and continue[] to breach the Amended LPA by: … accessing and misappropriating Catalyst's Confidential Information [and] competing with Catalyst")).  Moreover, Plaintiff's breach of fiduciary duty claim suffers from the same lack of specificity as Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, discussed *supra*, because it fails to specify how Defendants breached any fiduciary duty to Plaintiff, separate and apart from their alleged breaches of their contractual obligations under the LPA.  (*See id.* at ¶ 146 ("By the conduct alleged herein, [Defendants] have materially breached and continue to breach their fiduciary duties to [Plaintiff.]")).

Plaintiff's claim is identical in substance to its breach of contract claim and is therefore duplicative.  *See, e.g., Najjar Grp.,* 2017 WL 819487, at *5 (dismissing breach of fiduciary duty claim as duplicative where "the allegations supporting [p]laintiff's fiduciary duty claim … are 'either expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith'" (quoting *Brooks*, 809 N.Y.S.2d at 272)); *Uni-World Cap., L.P.* v. *Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (dismissing fiduciary duty claim as duplicative of breach of contract claim where "plaintiffs [did] not allege or point to a single fact supporting the proposed breach of fiduciary duty claim that [was] not already included in the proposed breach of contract claim").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  Plaintiff's claims for violation of the DTSA, common law misappropriation of trade secrets, and breach of the LPA survive Defendants' motion to dismiss.  By contrast, Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and breach of fiduciary duty are dismissed as duplicative of Plaintiff's breach of contract claim.

Defendants are ordered to file an Answer to the Complaint by May 24, 2022.  The parties are further ordered to file a joint status letter and proposed case management plan by June 7, 2022.

The Clerk of Court is directed to terminate the pending motion at docket entry 23.

SO ORDERED.

Dated:      May 10, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge