UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CATALYST ADVISORS, LP,

                                    Plaintiff,

                    -v.-

CATALYST ADVISORS INVESTORS GLOBAL
INC. ("CAIG") and CHRISTOS RICHARDS,

                                    Defendants.

21 Civ. 4855 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Catalyst Advisors, L.P. ("Catalyst"), an international executive recruitment firm, brings this action against two of its former partners, Catalyst Advisors Investors Global Inc. ("CAIG") and Christos Richards (together, "Defendants"), for allegedly misappropriating Plaintiff's proprietary information and then exploiting it to unfairly compete with Plaintiff. For this conduct, Plaintiff asserts claims for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839, common-law misappropriation of trade secrets, and breach of contract.

Discovery in this matter has concluded, and now pending before the Court are Defendants' motions *in limine*, seeking to preclude testimony from several of Plaintiff's fact and expert witnesses, and their correlative motion for summary judgment. For the reasons set forth herein, the Court denies Defendants' motions *in limine*, and, with one limited exception, denies Defendants' motion for summary judgment.

## BACKGROUND[1]

### A.   Factual Background

### 1.   The Parties and the Catalyst LPA

Plaintiff is an executive recruitment firm that specializes in the placement of "C-suite" level positions in the biopharmaceutical and life sciences industry.  Defendants are erstwhile partners of Catalyst.  Christos Richards worked as a partner at Catalyst from early January 2019 through October 4, 2019.  (Silverman MSJ Decl., Ex. 5 (Transcript of Deposition of Christos Richards ("Richards Depo.")) at 29:18-22).  CAIG is a Delaware

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment.  The Court primarily sources facts from Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #92)); Plaintiff's Local Rule 56.1 Statement and Response to Defendants' 56.1 Statement ("Pl. 56.1" and "Pl. Opp. 56.1" (Dkt. #95-1)); and Defendants' Response to Plaintiff's 56.1 Statement ("Def. Opp. 56.1" (Dkt. #99)).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion *in limine* as "Def. MIL Br." (Dkt. #74), and to certain exhibits attached to the Declaration of Madeline R. Silverman in Support of Defendants' Motion *in Limine* (cited using the convention "Silverman MIL Decl., Ex. [ ]"); to Defendants' memorandum of law in support of their motion for summary judgment as "Def. MSJ Br." (Dkt. #87), and to certain exhibits attached to the Declaration of Madeline R. Silverman in Support of Defendants' Motion for Summary Judgment (cited using the convention "Silverman MSJ Decl., Ex. [ ]"); to Plaintiff's consolidated memorandum of law in opposition to Defendants' motions *in limine* and for summary judgment as "Pl. Opp." (Dkt. #95), and to certain exhibits attached to the Declaration of Howard A. Matalon (cited using the convention "Matalon Decl., Ex. [ ]"); and to Defendants' consolidated reply as "Def. Reply" (Dkt. #98).

corporation, controlled and operated by its indirect controlling shareholder, Simon Bartholomew.  (Def. 56.1 ¶ 5).  CAIG, acting at all relevant times through Bartholomew, served as a partner at Catalyst from February 2014 through October 21, 2019.  (*Id.* ¶ 7).  Independent of CAIG, Bartholomew also operates a recruiting firm under his own name.  Originally established in or about 2011 as "Bartholomew & Company," the firm's name was changed in or about May 2019 to "Bartholomew Advisors."  (*See* Silverman MIL Decl., Ex. 4 (Transcript of Deposition of Simon Bartholomew ("Bartholomew Depo.")) at 39:14-40:16; *see also* Def. 56.1 ¶ 5).

Plaintiff is structured as a limited partnership and maintains a Limited Partnership Agreement (the "LPA" or the "Agreement"), which all limited partners, including Richards and CAIG, are required to execute.  (Pl. 56.1 ¶¶ 1-4).  Pertinent to the instant dispute, the LPA contains several provisions governing the confidentiality and use of Catalyst information, as well as a non-solicitation provision.  (*See generally* Silverman MSJ Decl., Ex. 8 (LPA)).

Specifically, the LPA requires all signatories to refrain from

> directly or indirectly, whether on the Partner's behalf or on behalf of any third party: (1) interfer[ing] with, divert[ing], or otherwise seek[ing] to terminate or cause to be terminated, the relationship of the Company with any Company Customer; or (2) provid[ing] services to any person that provides services in competition with the services provided by the Company.

(Pl. 56.1 ¶ 1 (quoting LPA § 5.6(a))).  The LPA further restricts the extent to which limited partners can disseminate "confidential and proprietary information relating to [Catalyst], including information relating to the

3

Company's financial condition, prospects, business plans, and intellectual property," and provides that such a restriction would remain in place "until the third anniversary of the date the Partner is no longer a Partner." (*Id.* ¶ 2 (quoting LPA § 5.9)).[2]  Pursuant to the LPA, each partner "expressly acknowledges ... that the disclosure of such confidential information to a third party would cause irreparable injury to the Company," and agrees to "use reasonable efforts to preserve the confidentiality of such information." (*Id.*). Finally, the LPA contains a non-solicitation provision with additional non-disclosure obligations, including the following:

> To protect Company's legitimate trade secrets, at all times while a Partner is a Partner and for a period of one (1) year following the termination of the Services, a Partner shall not, ... without the express prior written consent of the Company ... use any information provided by the Company pertaining to the Company's Partners, employees, independent contractors or vendors for any purpose other than for the purpose for which it was disclosed.

(*Id.* ¶ 3 (quoting LPA § 5.7)).

Separate from its confidentiality provisions, the LPA also contains a non-compete provision, effective only during a partner's tenure at Catalyst, that states:

> At all times while a Partner of the Company, a Partner shall not, directly or indirectly, whether on the Partner's behalf or on behalf of any third party: (1) interfere with, divert, or otherwise seek to terminate or cause to be terminated, the relationship of the company with any

---

[2]     The LPA defines "intellectual property" as "inventions, technology, software, databases, audio-visual works, designs, systems, trademarks, service marks, slogans, logos, information, trade secrets, processes, materials, methods, works of authorship or design, methods or improvements, or portions of any such material." (LPA § 5.8).

> Company Customer; or (2) provide services to any
> person that provides services in competition with the
> services provided by the Company.

(Pl. Opp. 56.1 ¶ 35 (quoting LPA § 5.6(a))).

### 2.  The Catalyst IP and Its Significance

### a.  The Catalyst IP and the Invenias and SharePoint Databases

To further its executive recruitment business, Plaintiff creates and maintains confidential and proprietary information related to its clients and potential candidates.  (Pl. 56.1 ¶ 5).[3]  As relevant here, this proprietary information includes a body of documents defined by Plaintiff as the "Catalyst IP," which includes, *inter alia*, resumes, *curricula vitae*, proposal letters, contracts, progress reports, notes from client update calls and discussions with candidates, offer letters, references, and other Catalyst internal documents. (Def. 56.1 ¶ 13; Pl. 56.1 ¶ 6).  Also among these Catalyst internal documents are notes; journals; communications with clients and candidates; internal communications with partners, employees, and contractors of Catalyst; lists of

---

[3]     The section of Plaintiff's Local Rule 56.1 statement setting forth Plaintiff's position with respect to the Catalyst IP relies heavily on the Declaration of Alyson Archer, submitted in connection with Plaintiff's opposition to Defendants' motion for summary judgment. (See Dkt. #95-2 (Declaration of Alyson Archer ("Archer Declaration" or "Archer Decl."))).  Defendants object to Plaintiff's citation to the Archer Declaration, repeating, with little to no differentiation, their conclusory objection that "Ms. Archer's declaration is a sham affidavit.  This is a continuing objection to every contention, the support for which, is Ms. Archer's Declaration."  (*See, e.g.*, Def. Opp. 56.1 ¶¶ 4-72).  For the reasons set forth in the Court's discussion of Defendants' motion to exclude the testimony and declarations of Alyson Archer, the Court finds that Defendants have not met their burden to demonstrate that the Archer Declaration is a sham affidavit.  (*See infra*, Section A.2.a.ii).  Therefore, the Court finds Defendants' objection to be nothing more than a conclusory statement by the opposing party, and insufficient to rebut those sections of Plaintiff's Local Rule 56.1 Statement for the purposes of the motion.  *See* Local Civil Rule 56.1(c).

candidates, clients, and projects; status memos; and notes about candidates, clients, and potential clients. (Pl. Opp. 56.1 ¶ 13 (citing Silverman MSJ Decl., Ex. 1); *Id.*, Ex. 2 (Transcript of Deposition of Alyson Archer ("Archer Depo.")) at 8:11-8:23; Archer Decl. ¶¶ 17-35). Plaintiff asserts that these internal documents reflect qualitative insights about clients and candidates, gleaned by Catalyst's partners and employees during confidential discussions with clients, candidates, references, and other sources during the search process. (Pl. 56.1 ¶ 32).

Catalyst primarily stores and maintains its IP in Invenias, a database licensed and managed by Catalyst, as well as on SharePoint, Catalyst's file system. (Pl. 56.1 ¶¶ 12-14).[4] Invenias is the primary repository for incoming and outgoing data and documents tied to search projects. (*Id.* ¶ 13). Within the Invenias database, the Catalyst IP is stored using three "master verticals," corresponding to companies, people, and search projects (the latter sometimes referred to in Invenias as "assignments"). (*Id.* ¶ 23). The data gathered and stored within these "verticals" is not static, but rather evolves to incorporate information gathered by Catalyst as it conducts its searches. (*Id.* ¶¶ 23-24).

---

[4]     Throughout the section of Plaintiff's Local Rule 56.1 Statement discussing the Catalyst IP, Defendants repeat their objection that "[t]he information contained on Invenias is publicly available." (*See, e.g.*, Def. Opp. 56.1 ¶ 5). Defendants' objection, however, is plainly belied by record evidence demonstrating that the Invenias database contains numerous non-public documents and work product, and is similarly insufficient to controvert those corresponding portions of Plaintiff's Local Rule 56.1 Statement. (*Compare* Def. Opp. 56.1 ¶¶ 5-12, *with* Archer Depo. 157:5-158:22, 160:6-17 (testifying regarding confidential information contained in the Invenias database), *and* Silverman MSJ Decl., Ex. 6 ("Barson Report" or "Barson Rep.") (providing screenshots of Invenias database, including of non-public "Candidate Summary/Assessment Notes from Catalyst")).

In particular, Catalyst may add new candidates and companies discovered during a search, and may also update existing candidates and companies to reflect newly discovered information.  (*Id.* ¶ 24).

Catalyst represents that the Catalyst IP contained within the Invenias database "represents the accumulation, creation, and analysis of over a decade of data and documents generated by Catalyst's limited partners and employees regarding its target industry …, [its] clients, the universe of executive candidates, and the search projects [it] has conducted."  (Pl. 56.1 ¶ 16). Further, according to Catalyst, the process of developing and maintaining the Catalyst IP is substantial, reflecting significant time spent by its employees and limited partners discussing executive roles with its clients and interviewing candidates to assess their fit and eligibility for various roles.  (*Id.* ¶ 10).

### b. Catalyst's Use of the Catalyst IP in the Search Process

Clients retain Catalyst to perform "search projects," which are engagements to fill executive roles on behalf of those clients.  (Pl. 56.1 ¶ 21). These projects begin with the signing of an engagement letter between Catalyst and the client, after which Catalyst designates the search project as open in Invenias.  (*Id.* ¶ 22).  Next, Catalyst creates a "position specification" that is unique to the client and the client's role.  (*Id.* ¶ 25).  Catalyst customizes this specification by relying on contemporaneous client input, as well as data from the Catalyst IP that informs Catalyst's understanding both of the relevant market for the position, and of the profile of the targeted executive to be

recruited for the position.  (*Id.* ¶¶ 25-27).  Catalyst then refines this position specification based on further discussions with the client.  (*Id.* ¶ 28).

According to Plaintiff, these position specifications reflect highly confidential inputs from the client, including sensitive information regarding the target candidate profile, the client's financial condition, the client's existing and future leadership, and the client's competitors.  (Pl. 56.1 ¶ 29).  These inputs provide Catalyst with special knowledge and ability to compete with other recruiting firms who do not have this information, in particular by allowing Catalyst to have an up-to-date understanding of the financial conditions of clients and competitor companies, the leadership turnover within those companies, and the relative standing of companies in the market.  (*Id.* ¶¶ 30, 33-34).

Once a position specification has been developed, Catalyst uses the Catalyst IP stored in Invenias to identify target companies and to create a candidate "target list" derived from those companies.  (Pl. 56.1 ¶¶ 31-32, 35). In particular, Catalyst draws from a universe of individual candidate profiles maintained in Invenias; these profiles contain biographical information, as well as non-public data regarding compensation, feedback from that candidate's interviews for other positions, and other impressions gained from Catalyst's previous interactions with that candidate.  (*Id.* ¶¶ 36-38).  As with the creation of the position specification, a Catalyst staff member proficient in deciphering the information contained within Invenias will customize the "target list" through application of filters to reflect the needs of the role.  (*Id.* ¶ 36).

8

Thereafter, Catalyst engages in sensitive and confidential conversations with these candidates, where the candidates may disclose to Catalyst, among other things, their willingness to leave their current position, their compensation requirements, their assessments of the client and the marketplace, and other personal considerations.  (Pl. 56.1 ¶ 38).  Candidates may also share a *curriculum vitae* or a resume with Catalyst along with other non-public documents, such as a biography, deal sheet, patents, publications, or compensation expectations.  (*Id.* ¶¶ 42, 43).  For finalist candidates, Catalyst obtains that candidate's compensation information and expectations, and also conducts references for that candidate.  (*Id.* ¶¶ 53, 55).  Upon the completion of a search project, Catalyst obtains the final terms of the client company's offer and the candidate's acceptance.  (*Id.* ¶ 58).

As with client information, Catalyst feeds this newly-acquired candidate data back into the candidate profiles in Invenias, such that the profiles reflect the most recent summaries of the client interviews of the candidate, as well as related positive and negative impressions by the candidate of the client, and *vice versa*.  (Pl. 56.1 ¶¶ 37-40, 44-47, 49-50).  This up-to-date information allows Catalyst to pre-screen candidates for future searches, enabling cost efficiencies and boosting its likelihood of success in matching candidates with suitable clients in the future.  (*Id.* ¶¶ 41, 48).  For example, the compensation information may assist Catalyst in filtering targeted executives where compensation may be a concern.  (*Id.* ¶ 54).  More broadly, this information gives Catalyst an understanding of the executive compensation landscape in

the marketplace, allowing it to better advise clients.  (*Id.*).  Overall, Catalyst's

capture of this feedback allows it to understand the pool of putative target

clients and candidates, and to leverage this understanding for business

development and talent recruitment.  (*Id.* ¶ 52).

### 3.   Richards's Departure from Catalyst

#### a.   Richards's Pre-Departure Activities on Catalyst's Computer Systems

On or about August 8, 2019, while contemplating his departure from the

company, Richards traveled to Catalyst's New York office to attend a partner

meeting.  (Richards Depo. 139:3-139:7; Def. Opp. 56.1 ¶¶ 67, 73).  At that

meeting, Richards exchanged his work laptop for a new laptop issued by

Catalyst after stating that the older laptop was not functional.  (*See* Richards

Depo. 95:12-97:18).  To set up this new laptop, Richards requested and

received a Lexar USB device containing approximately 10,952 files from

Catalyst's system, including many documents maintained on Invenias that

constitute Catalyst IP.  (Silverman MSJ Decl., Ex. 10 (Digital Forensics Report

prepared by Tino Kyprianou ("Kyprianou Report" or "Kyprianou Rep.")) at 8;[5]

Dkt. #95-2 (Declaration of Alyson Archer ("Archer Declaration" or "Archer

Decl.")) at ¶¶ 113-114; Richards Depo. 97:5-18).  Though Richards dissociated

from Catalyst on October 4, 2019, he did not return the Lexar USB device

containing the Catalyst IP until the following week, on or about October 7,

---

[5]     This same report is also included as Exhibit J to the Silverman Declaration in support
of Defendants' motion *in limine*.  (*Accord* Silverman MIL Decl., Ex. J).  To avoid
duplicative citation, the Court does not distinguish between the corresponding docket
entries in its discussion of the Kyprianou Report.

2019.  (Richards Depo. 70:14-71:1; Silverman MSJ Decl., Ex. 12 (Transcript of Deposition of Tino Kyprianou ("Kyprianou Depo.")) at 40:16-41:15).

In the time period between receiving his new laptop on August 8, 2019, and departing Catalyst on October 7, 2019, Richards accessed a number of files on the Catalyst system.  (*See* Kyprianou Rep. 10-12).  Forensic analysis of his computer indicates that Richards generated log records corresponding to access of a significant volume of files comprising Catalyst IP from Catalyst's internal systems, including its SharePoint site.  (*See id.* (indicating that Richards accessed 743 documents on Catalyst's systems and generated 71,419 "reparse points" corresponding to access of Catalyst's SharePoint site)).[6]

Catalyst further identifies a subset of 327 documents, located on Richards's new laptop, that were created during that time period, and that Catalyst maintains Richards had no reason to access for the search projects that he was conducting at that time.  (Kyprianou Rep. 14-16; Pl. 56.1 ¶ 69).  These documents include zip files containing non-public *curricula vitae* for candidates that Catalyst presented to its clients; status memos or status reports for searches on which Richards was not working; reference reports for searches on which Richards was not working; and spreadsheets reflecting at

---

[6]    *See* Kyprianou Rep. 11:

> [A] "reparse point" is a feature in the Windows operating system that allows a file or folder to be redirected to another location on the system.  When a program or user attempts to access a file or folder that has a reparse point, the operating system intercepts the request and redirects it to the location specified by the reparse point.  This allows programs and users to access files and folders as if they were located in a different directory.

least one search on which Richards was not working.  (Kyprianou Rep. 15).

Additional forensic analysis indicated that, while this access was taking place,

Richards also accessed several cloud storage accounts and connected several

USB devices to his Catalyst laptop, though the analysis does not indicate what

materials, if any, were transmitted over these connections.  (*Id.* at 13-14; Pl.

56.1 ¶¶ 70-72).

### b.    The Krystal Biotech Search

On July 16, 2019, while still a limited partner of Catalyst, Richards sent

a proposal letter to Krystal Biotech, Inc. ("Krystal Biotech"), a potential client

for a chief business officer search.  (Pl. 56.1 ¶ 83).  On or about September 23,

2019, after Richards had already drafted a letter of resignation from Catalyst,

and less than three weeks prior to his departure, Richards drafted an email to

Krystal Biotech ostensibly discontinuing the engagement.  (*Id.* ¶¶ 84-85).

Specifically, Richards advised the client that it would "make the most sense to

withdraw the proposal," as "we c[ould] always pick this up" at a later time.  (*Id.*

¶ 84 (quoting Matalon Decl., Ex. 6)).

After departing Catalyst on October 7, 2019, Richards began employment

at non-party Spencer Stuart International ("Spencer Stuart"), a different

executive recruiting firm, where he worked until September 30, 2022.

(Richards Depo. 17:12-20).  According to its records, on December 4, 2020,

Spencer Stuart was engaged by Krystal Biotech to conduct a search for a chief

commercial officer.  (Pl. 56.1 ¶ 86 (citing Matalon Decl., Ex. 7)).

4.      **The Atkins Search, Bartholomew Advisors, and CAIG's Departure from Catalyst**

As Plaintiff tells it, CAIG/Bartholomew also improperly accessed the Catalyst IP before separating from the company.  By way of background, in or before early March 2019, CAIG had been approached by Atkins, a former client of Catalyst, to conduct a search for a Divisional MD.  (Silverman MSJ Decl., Ex. 9).  Catalyst had previously completed a search for a digital director within Atkins in either 2017 or 2018.  (Pl. 56.1 ¶ 93; *see also* Archer Depo. 19:19-22:2).  On March 4, 2019, Bartholomew sent an email to John Archer, the Managing Partner of Catalyst, informing him of the outreach, and estimating that "retainers would be around £60k with a total fee of £80-£90k."  (Silverman MSJ Decl., Ex. 9).  Bartholomew further wrote:  "I understand this is not Catalyst's business, should we pass on it, or would the revenue be helpful in London?"  (*Id.*).  Writing in response, John Archer indicated that "[w]e should get the input from other partners on today's call," but that "[p]ersonally speaking, [he was] not in favor" of taking on the project.  (*Id.*).  That same day, Bartholomew forwarded the email correspondence to Richards, writing:  "Fyi, if it is not Catalyst's business (as per our Managing Partner's response below) then Catalyst should turn it down — right?"  (*Id.*).  At the subsequent partners' meeting, it was decided that Catalyst would not conduct the search, and Bartholomew was told to turn the search down.  (*See* Bartholomew Depo. 50:5-12).

While turning the search down on behalf of Catalyst, Bartholomew undertook the project through Bartholomew Advisors in or about May 2019

(the "Atkins Search").  (Pl. 56.1 ¶ 92; *see also* Bartholomew Depo. 40:19-23,

50:10-51:6).  What is more, while Bartholomew Advisors was working on the

Atkins Search, CAIG used a target list (the "Atkins List") that had been created

utilizing Catalyst IP from Invenias.  (Pl. 56.1 ¶¶ 95, 97).  The list had been

prepared by Lucy Thelluson, a Senior Research Associate at Catalyst, and sent

by Thelluson to Bartholomew on March 5, 2019, the day after John Archer

indicated it was likely that Catalyst would turn down the project.  (Matalon

Decl., Ex. 8).  Ultimately, CAIG, through Bartholomew Advisors, completed the

Atkins Search project for a fixed fee of £95,000.  (Pl. 56.1 ¶ 102; Bartholomew

Depo. 67:20-70:19).

Approximately seven months after turning down the Atkins Search, CAIG

dissociated from Catalyst during a partner meeting held on October 21, 2019.

(Pl. 56.1 ¶ 103).  That same day, Thelluson sent an email to Marisa Pezzuto, a

Project Coordinator at Catalyst, attaching a separate list (the "Immatics List")

and requesting that Pezzuto print out the last section of the list in hard copy.

(Bartholomew Depo. 80:9-13; Matalon Decl., Ex. 10 ("Marisa — last section ie

page 25 — 75 double sided print pls")).  The Immatics List is a candidate list,

containing the names of more than 1,100 executives that Catalyst maintains

were derived from the Catalyst IP contained within Invenias.  (Pl. 56.1 ¶ 108).

At the time of CAIG's dissociation, Bartholomew left Catalyst's London office

with a printed copy of the Immatics List, and with the admitted intention of

using the List to secure a search project.  (*Id.* ¶¶ 109-110).  On or about

October 22 or 23, 2019, Bartholomew returned the hard copy of the list to

Arnaldo de Lisio, another Catalyst Limited Partner.  (*Id.* ¶ 111; Bartholomew Depo. 133:9-15).  Bartholomew testified that he did so due to his belief that possession of the Immatics List after dissociation was "inappropriate." (Bartholomew Depo. 134:8-18).

## B.   Procedural History

Plaintiff commenced this lawsuit with the filing of a complaint against Defendants on June 1, 2021, asserting claims for misappropriation of trade secrets under the DTSA and New York common law, as well as for breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty.  (Dkt. #1).  The following month, on July 21, 2021, Defendants filed a pre-motion letter indicating their intent to move to dismiss the complaint in lieu of an answer.  (Dkt. #14).  Plaintiff filed a letter in opposition to Defendants' pre-motion letter on July 26, 2021.  (Dkt. #15).  The Court dispensed with its typical requirement that the parties attend a pre-motion conference in favor of setting a briefing schedule for Defendants' motion that included an opportunity for Plaintiff to amend its pleadings.  (Dkt. #16).

Plaintiff filed the Amended Complaint on August 19, 2021.  (Dkt. #17). Thereafter, in accordance with the briefing schedule, Defendants filed their motion to dismiss and supporting papers on September 23, 2021.  (Dkt. #22-25).  On October 12, 2021, Plaintiff filed a letter seeking the Court's leave to proceed with discovery during the pendency of Defendants' motion to dismiss (Dkt. #26), to which Defendants responded the following day (Dkt. #27).  The Court denied Plaintiff's motion on October 18, 2021.  (Dkt. #28).  Three days

later, Plaintiff filed its memorandum of law in opposition to Defendants' motion

to dismiss.  (Dkt. #29).  Defendants filed their reply brief on November 4, 2021.

(Dkt. #30).

On May 10, 2022, the Court issued an Opinion and Order granting in

part and denying in part Defendants' motion to dismiss, familiarity with which

is presumed in this Opinion.  *See Catalyst Advisors, L.P.* v. *Catalyst Advisors*

*Invs. Glob. Inc.*, 602 F. Supp. 3d 663 (S.D.N.Y. 2022).  In particular, the Court

found that Plaintiff's claims for violation of the DTSA, common-law

misappropriation of trade secrets, and breach of the LPA survived Defendants'

motion to dismiss, but that Plaintiff's claims for breach of the implied covenant

of good faith and fair dealing and breach of fiduciary duty would be dismissed

as duplicative of Plaintiff's breach of contract claim.  *Id.* at 680.

The parties then proceeded to discovery, pursuant to a civil case

management plan and scheduling order entered by the Court on June 8, 2022.

(Dkt. #38).  On November 7, 2022, the Court, by memo endorsement, ruled on

several outstanding discovery disputes between the parties.  (Dkt. #41

(Plaintiff's letter motion to compel discovery), 42 (Defendants' response in

opposition), 43 (memo endorsement)).  As a preliminary matter, the Court

found that Defendants had taken a dilatory approach to depositions, in direct

conflict with the scheduling order entered five months prior, and ordered the

Defendants to appear for depositions in a timely fashion.  (Dkt. #43 at 5).  The

Court also granted Plaintiff's motion to compel document production, finding

that Defendants had been similarly deficient in their responses to Plaintiff's

interrogatories, including by failing to provide "a list of various devices used [by Richards] to conduct business on behalf of Catalyst or to store, share, or utilize Catalyst IP." (*Id.* at 6).  Finally, the Court ordered the parties to meet and confer with respect to the issue of Defendants' responses to Plaintiff's interrogatories.  (*Id.* at 7).

Following two extensions of the fact and expert discovery deadlines (Dkt. #54, 56), the parties appeared before the Court for a post-fact discovery conference on February 23, 2023, at which conference the Court granted a further extension of the expert discovery deadline to May 5, 2023 (Dkt. #63). Notwithstanding this deadline, the parties requested, and the Court reluctantly granted, an extension to complete expert discovery until May 26, 2023.  (Dkt. #66).  On May 25, 2023, the parties filed, and the Court endorsed, a proposed briefing schedule for Defendants' motion for summary judgment.  (Dkt. #68). On June 26, 2023, Defendants filed a motion *in limine*, which was stricken from the public docket in light of its conflict with the Court's rules and with the protective order governing the case.  (*See* June 26, 2023 Minute Entry; Dkt. #72).  Given Defendants' apparent intent to continue with the motion *in limine*, the Court modified the summary judgment briefing schedule to permit consolidated briefing on both topics.  (Dkt. #72).

Per the Court's order, Defendants filed their motion *in limine* and accompanying exhibits on June 29, 2023.  (Dkt. #74 (Def. MIL Br.); 74-1 (Silverman MIL Decl.)).  Following certain docketing issues (*see* Dkt. #79-86), Defendants filed their motion for summary judgment on August 28, 2023.

(Dkt. #88 (Def. MSJ Br.), 89 (Silverman MSJ Decl.), 92 (Def. 56.1)).  On

October 13, 2023, Plaintiff filed its consolidated opposition to Defendants'

motion *in limine* and motion for summary judgment.  (Dkt. #95 (Pl. Opp.), 95-1

(Pl. 56.1), 95-2 (Archer Decl.), 95-3 (Matalon Decl.), 97 (sealed exhibits to the

Matalon Declaration)).  Finally, Defendants filed their consolidated reply in

support of their motion *in limine* and motion for summary judgment on

November 3, 2023.  (Dkt. #98 (Def. Reply), 99 (Def. Opp. 56.1)).

## DISCUSSION

### A.   The Court Denies Defendants' Motions *in Limine*

The Court first considers Defendants' motions *in limine*, as they bear on

the scope of admissible testimony that may be considered in connection with

Defendants' motion for summary judgment.  *Cf. Grabin* v. *Marymount*

*Manhattan Coll.*, 659 F. App'x 7, 8-9 (2d Cir. 2016) (summary order) (observing

that district courts have considerable discretion to entertain a summary

judgment based on its rulings on motions *in limine* (citing *Sira* v. *Morton*, 380

F.3d 57, 68 (2d Cir. 2004); *Brown* v. *City of Syracuse*, 673 F.3d 141, 147 n.2

(2d Cir. 2012))).  "Although it is true that 'the nonmoving party need not

produce evidence in a form that would be admissible at trial in order to avoid

summary judgment,' 'any evidence considered on summary judgment must be

reducible to admissible form.'"  *Id.* at 9 (alteration adopted) (first quoting

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 324 (1986), and then quoting *Figueroa* v.

*Mazza*, 825 F.3d 89, 98 n.8 (2d Cir. 2016)).  Here, Defendants' motions

concern the admissibility of certain lay and expert witness testimony under the

Federal Rules of Evidence, as well as deposition testimony taken pursuant to Federal Rule of Civil Procedure 30(b)(6).

### 1.    Applicable Law

### a.    Motions *in Limine* Generally

A trial court's "inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Cap. Mgmt., L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce* v. *United States*, 469 U.S. 38, 41 n.4 (1984)).  A motion *in limine* is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial." *Palmieri* v. *Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).  "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States* v. *Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001).

"Courts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate context." *Gogol* v. *City of New York*, No. 15 Civ. 5703 (ER), 2018 WL 4616047, at *1 (S.D.N.Y. Sept. 26, 2018) (citing *Nat'l Union Fire Ins. Co.* v. *L.E. Myers Co. Grp.*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996)).  Further, a district court's ruling on a motion *in limine* is preliminary and "subject to change when the case unfolds." *Luce* v. *United States*, 469 U.S. 38, 41 (1984).  The moving party bears the burden of establishing that evidence is inadmissible for any purpose and so properly excluded on a motion *in limine*.  *See United States* v. *Pugh*, 162 F. Supp. 3d 97,

101 (E.D.N.Y. 2016).  Moreover, the moving party must provide "the necessary specificity with respect to the evidence to be excluded," to carry its burden on the motion.  *Nat'l Union*, 937 F. Supp. at 287.

The general admissibility of evidence is governed by Federal Rule of Evidence 402, which provides that evidence must be relevant in order to be admissible at trial.  Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The standard is "very low."  *United States* v. *White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United States* v. *Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008)).  Indeed, all relevant evidence is presumably admissible unless the United States Constitution, a federal statute, the Federal Rules of Evidence, or rules prescribed by the Supreme Court provide otherwise.  *Accord* Fed. R. Evid. 402; *White*, 692 F.3d at 246.

### b.    Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  *See Kumho* v. *Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 149, (1999); *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993).  In particular, Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if ... :
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has emphasized in its decisions in *Daubert* and *Kumho Tire* that courts have a "'gatekeeping' function under Rule 702," under which they are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 597). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007). "The Second Circuit has distilled Rule 702's requirements into three broad criteria: [i] qualifications; [ii] reliability; and [iii] relevance and assistance to the trier of fact." *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 282 (S.D.N.Y. 2022) (citing *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

### c.     Depositions Pursuant to Rule 30(b)(6)

Federal Rule of Civil Procedure 30(b)(6) permits a corporation to designate one or more persons to testify on its behalf regarding "information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6); *see also Reilly* v. *Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999). The

Rule "implicitly requires such persons to review all matters known or reasonably available to [the corporation] in preparation for the Rule 30(b)(6) deposition." *Twentieth Century Fox Film Corp.* v. *Marvel Enters., Inc.*, No. 01 Civ. 3016 (AGS) (HB), 2002 WL 1835439, at *2-3 (S.D.N.Y. Aug. 8, 2002) (internal quotation marks and citation omitted). Still, "[i]t is well-settled that a Rule 30(b)(6) deposition is not a 'memory contest,'" in particular where topics are "better suited to a written response or a supplemental document production." *Jenkins* v. *XpresSpa Grp., Inc.*, No. 19 Civ. 1774 (VEC) (SLC), 2020 WL 1644012, at *5 (S.D.N.Y. Apr. 2, 2020) (quoting *Blackrock Allocation Target Shares: Series S Portfolio* v. *Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 9371 (KPF) (SN), 2017 WL 9400671, at *2 (S.D.N.Y. Apr. 27, 2017)).

Rule 37(d)(1)(A)(i) authorizes sanctions where the Rule 30(b)(6) witness is so unprepared that it is "tantamount to a failure to appear." *Crawford* v. *Franklin Credit Mgmt. Corp.*, 261 F.R.D. 34, 38-39 (S.D.N.Y. 2009) (citations omitted); *see also* Fed. R. Civ. P. 30(d) (allowing sanctions on "a person who impedes, delays, or frustrates the fair examination of the deponent"). A party seeking sanctions for an unprepared Rule 30(b)(6) witness bears the burden to show that the deponent's inability to testify was "egregious and not merely lacking in desired specificity in discrete areas." *Fashion Exch. LLC* v. *Hybrid Promotions, LLC*, 333 F.R.D. 302, 308 (S.D.N.Y. 2019) (citation omitted).

## 2.   Analysis

Defendants take issue with the testimony of three witnesses in this matter:  Alyson Archer, Plaintiff's Chief Operating Officer, who testified in a

Rule 30(b)(6) deposition on Plaintiff's behalf; Kalman Barson, Plaintiff's expert witnesses on the subject of valuation of the Catalyst IP; and Tino Kyprianou, Plaintiff's digital forensics expert. The Court assesses Defendants' claims as to each witness in turn.

### a.    Archer's Rule 30(b)(6) Deposition and Declaration Are Admissible

Defendants raise two arguments for excluding Archer's testimony. *First*, Defendants suggest that Archer was unprepared for her Rule 30(b)(6) deposition and seek sanctions for same. (Def. MIL Br. 3-6.) *Second*, Defendants contend that to the extent Archer's Rule 30(b)(6) testimony is deemed admissible, her subsequent declaration — submitted in connection with Plaintiff's opposition to Defendants' motion for summary judgment — must be rejected as an inadmissible "sham affidavit." (Def. Reply 1-3).[7] For the reasons set forth herein, the Court finds that neither of Defendants' arguments succeeds.

### i.    Defendants Fail to Demonstrate That Archer Was Unprepared for Her Rule 30(b)(6) Deposition

According to Defendants, Archer's lack of preparedness at her deposition was evidenced by her impermissibly vague answers to Defendants' questions, including an inability to identify specific documents comprising the Catalyst IP. (*See* Def. MIL Br. 3-6.) Upon its own review of the record, the Court cannot conclude that Archer's testimony was so lacking in specificity as to merit

---

[7]    As Archer's declaration was submitted in connection with Plaintiff's opposition brief, Defendants raise this argument for the first time in their reply brief.

preclusion or other sanctions.  After all, in the context of a Rule 30(b)(6)

deposition, the fact that a deponent's testimony is "merely lacking in desired

specificity in discrete areas," is not evidence of the egregious inadequacies that

are required to support sanctions under the Rules.  *Kyoei Fire & Marine Ins.*

*Co.* v. *M/V Mar. Antalya*, 248 F.R.D. 126, 152 (S.D.N.Y. 2007) (quoting *Bank of*

*New York* v. *Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y.

1997)).

   As one example, a review of the entire colloquy between Archer and

defense counsel regarding CAIG's alleged diversion of business from Catalyst

undermines Defendants' argument that "all [] Archer could offer was that the

'evidence [was in] [d]iscovery.'"  (Def. MIL Br. 4 (quoting Archer Depo. 25:16-

25)).  To the contrary, Archer testified that Plaintiff's theory regarding CAIG's

diversion was supported by specific emails, produced in discovery, between

Bartholomew and several specific individuals, which emails reflected that

Bartholomew would "receive a 20 percent referral fee directly from [a

competitor] ... within 14 days of [the competitor] being paid."  (Archer

Depo. 26:1-20).  This testimony provided Defendants with more than enough

information regarding Plaintiff's theory, as well as sufficient detail to identify

the relevant documents in discovery.  Similarly specific was Archer's testimony

regarding the clients that Richards allegedly poached from Catalyst upon his

departure.  (*See, e.g.*, *id.* at 14:10-18:16 (naming the specific companies that

Plaintiff was alleging Defendants had diverted from Plaintiff's business)).  And

Archer explicated Plaintiff's theories regarding how Richards induced Krystal

Biotech and Ascendis Pharmaceuticals to leave Catalyst for Spencer Stuart, Richards's new employer, upon Richards's departure.  (*Id.* at 36:3-45:18).

Archer also responded adequately to Defendants' questions regarding Plaintiff's position that CAIG allegedly misappropriated the Immatics and Atkins Lists.  (Def. MIL Br. 5).  In particular, Archer clarified Plaintiff's position that the lists were comprised of Catalyst IP, possibly drawn from the Invenias database.  (Archer Depo. 76:19-78:9).  That Archer equivocated as to whether the lists were actually drawn from the Invenias database is, of course, an issue that Defendants may use to impeach Archer's credibility at trial.  It is not, however, a basis on which her testimony should be excluded.  More fundamentally, Archer's testimony reflects Plaintiff's theory of trade secrets in this case, which is that the Catalyst IP — maintained in the Invenias and SharePoint databases — encompasses the nonpublic client and candidate information, including resumes, compensation information, and correspondence, as well as Catalyst internal documents, such as work product memorializing impressions of candidates and clients.  (*See id.* at 119:15-120:11, 125:20-126:6, 157:5-158:11).

Finally, it bears mention that Defendants' objections to Archer's testimony largely concern the merits of the case — such as whether Plaintiff is capable of describing its trade secrets with specificity — and for this reason are inapposite in the context of a motion *in limine*, which is concerned with questions of evidence.  *See Carlson* v. *Northwell Health Inc.*, No. 20 Civ. 9852 (LAP), 2022 WL 1304453, at *2 (S.D.N.Y. May 2, 2022) ("[A] motion *in limine* is

25

not the proper vehicle for seeking a dispositive ruling on a claim." (citation and quotation omitted)); *see also Williams* v. *Rushmore Loan Mgmt. Servs. LLC*, No. 15 Civ. 673 (RNC), 2017 WL 822793, at *1 (D. Conn. Mar. 2, 2017) (surveying nationwide cases and observing that "[i]t is well settled that motions *in limine* address evidentiary questions and are inappropriate devices for resolving substantive issues, such as the sufficiency of the evidence to support a claim or defense" (alteration adopted) (collecting cases)). Indeed, Defendants bolster their argument that Archer's testimony was impermissibly vague by relying on several cases that discuss the specificity requirement of a trade secrets claim. (*See* Def. MIL Br. 4-5 (citing *Sit-Up Ltd.* v. *IAC/InterActiveCorp*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *5 (S.D.N.Y. Feb. 20, 2008); *Big Vision Private Ltd.* v. *E.I. DuPont De Nemours & Co*, 1 F. Supp. 3d 224, 263 (S.D.N.Y. 2014), *aff'd*, 610 F. App'x 69 (2d Cir. 2015) (summary order))). Such cases, obviously, are of limited relevance to the Court's ruling on an evidentiary motion. Accordingly, the Court finds that Defendants have not demonstrated that Archer was unprepared for her Rule 30(b)(6) deposition, and therefore have not established their right to sanctions under Rule 37(d)(1)(A)(i).[8]

---

[8]    The Court will reserve decision on Defendants' claims of late-produced discovery until closer to trial. *See Gogol* v. *City of New York*, No. 15 Civ. 5703 (ER), 2018 WL 4616047, at *1 (S.D.N.Y. Sept. 26, 2018) ("Indeed, courts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." (citing *Nat'l Union Fire Ins. Co.* v. *L.E. Myers Co. Grp.*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996))).

###### ii.     Defendants Fail to Establish That Archer's Declaration Is a Sham Affidavit

Defendants also maintain that portions of Plaintiff's Local Rule 56.1 Statement that rely on the Archer Declaration cannot be considered because the Declaration is an impermissible "sham affidavit." (Def. Reply 1). Under the sham affidavit rule, a "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes* v. *N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). That said, "the principle does not apply if the deposition and the later sworn statement are not actually contradictory." *Palazzo ex rel. Delmage* v. *Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (citing *White* v. *ABCO Eng'g, Corp.*, 221 F.3d 293, 304 (2d Cir. 2000)). "Thus, [the rule] does not apply where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition." *Id.* (citing *Rule* v. *Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

Defendants' argument that the Archer Declaration is a sham affidavit rests principally on their objection to the timing of its submission — after discovery had closed, and in connection with Plaintiff's opposition to the motion for summary judgment. (Def. Reply 1-2). Timing alone, however, is an insufficient basis to preclude the testimony. Rather, application of the sham affidavit rule turns on whether the later-offered testimony contradicts the prior testimony, as noted above. On this issue, Defendants do not specify how the Archer Declaration contradicts Archer's testimony in her Rule 30(b)(6)

deposition.  (*See id*.).  Nor is it the Court's obligation to review the record for every instance of possibly contradictory testimony to make up for Defendants' failure to do so.  *See Potter* v. *District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) ("[J]udges 'are not like pigs, hunting for truffles buried in briefs' or the record." (quoting *United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)); *cf. Morisseau* v. *DLA Piper*, 532 F. Supp. 2d 595, 618 (S.D.N.Y. 2008) (observing that a court is not "obliged to sift through a large [ ] record against the possibility that it will find something to warrant denial of the motion that the non-moving party has not bothered to call to its attention").

Having done Defendants' work for them by reviewing the record, the Court finds that the Archer Declaration permissibly supplements, rather than impermissibly contradicts, Archer's prior testimony.  It is well established that subsequent testimony "does not 'contradict' a Rule 30(b)(6) deponent when that [testimony] offers information about which the deponent had disclaimed knowledge or expressed uncertainty."  *Keepers, Inc.* v. *City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) (citing *Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014)).  Such is the case here where, for example, Archer testified at her deposition that she believed that the Immatics and Atkins Lists were drawn from the Catalyst IP contained in the Invenias database, but was not entirely certain.  (*See* Archer Depo. 78:3-15).  In her subsequent Declaration, Archer confirmed that the Atkins List was a "target list"; that the Immatics List was a "candidate list"; and that both Lists were drawn, in part, from the Catalyst IP contained in the Invenias database.  (*See* Archer Decl.

¶¶ 90-100).  In short, Defendants have not met their burden to demonstrate

that the Archer Declaration is a sham affidavit that should be precluded from

consideration at summary judgment.

> **b.    Barson's Expert Report and Testimony Are Not Clearly Inadmissible**

Next, the Court turns to the admissibility of Barson's expert testimony,

which was generally commissioned by Plaintiff "to determine the cost of

Catalyst's proprietary business information (essentially a data base of

confidential information about individuals) misappropriated by CAIG."

(Silverman MIL Decl., Ex. H (Expert Report prepared by Kalman A. Barson

("Barson Rep.")) at 3).[9]  While they do not expressly invoke Rule 702,

Defendants broadly maintain that the Barson Report contains fact, rather than

expert testimony, and therefore should be excluded.  This argument, however,

is supported only by Defendants' conclusory assertion that "the cost of

developing Catalyst's so called trade secrets is a fact that does not require

expert testimony."  (Def. Reply 15).  Put slightly differently, Defendants assert

that Barson's expert opinion merely reflects "simple arithmetic," and is

therefore inadmissible, as it was "not generated based on specialized knowledge

but rather involved [only] basic calculations."  (Def. MIL Br. 9-10).

Notably, Defendants' characterization of Barson's testimony was

vigorously disputed by Barson himself, who explained at his deposition that his

---

[9]    Like the Kyprianou Report, the Barson Report was incorporated in both Defendants' motion *in limine* and motion for summary judgment, and the Court does not distinguish between the corresponding docket entries in its discussion of the Report.  (*See* Silverman MSJ Decl., Ex. 6).

process involved more sophisticated analyses than that for which Defendants gave him credit.  (*See* Silverman MIL Decl., Ex. F (Transcript of Deposition of Kalman A. Barson ("Barson Depo.")) at 47:20-48:1).  To differentiate his work from that of a lay witness, Barson testified that he used his expert background to identify and request from Plaintiff the appropriate inputs to his valuation model, which inputs might not have been readily apparent to a layperson trying to conduct the same analysis.  (*Id.* at 20:5-20:21, 45:4-46:10).  As Barson put it, a layperson would not evaluate the issue "along the lines of a litigat[ion-]oriented financial investigator," such that "what she would provide may not be and in all likelihood would not be what would be needed" to estimate the value of the Catalyst IP contained in the Invenias database.  (*Id.* at 45:22-46:2).

Barson's analysis, as explained by his testimony, falls within the province of admissible expert testimony.  Such testimony includes that which "synthesizes" and "'summarizes' data in a manner that 'streamline[s] the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'"  (Pl. Opp. 45 (quoting *Louis Vuitton Malletier S.A.* v. *Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015))).  Indeed, in *Louis Vuitton Malletier*, on which Plaintiff relies, the court admitted a damages expert's testimony over defendants' objection that the expert "simply took data produced by [her client] and reformatted it."  97 F. Supp. 3d at 504.  That court reasoned that the plaintiff's expert "did more than simply add a few numbers — she combed through at least 100 pages of sales reports, compiled

and aggregated the data …, and presented it in a more readily understandable format." *Id.* So too here, where Barson developed an approach to benchmark the average cost associated with development of the voluminous pool of entries in the Invenias database (Barson Depo 17:3-19:7), and then calculated that number by soliciting, reviewing, and synthesizing several data sources reflecting both the amount of time Plaintiff's partners and employees spent working on the Catalyst IP in the Invenias database, and the content and growth of entries contained in the Invenias database over time (Barson Rep. 3-4).

Nor is it of any great significance that Barson did not formally apply his training as a CPA in conducting the analysis, given Barson's representation that his analysis reflected his expertise in financial investigations, generated across years of experience. (Barson Depo. 44:8-45:10). *See I.M.* v. *United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004))). Ultimately, the Court declines to penalize Barson for providing summary analysis in his expert report that is "presented [] in a more readily understandable format" for a lay audience, especially in light of Barson's specific defense of his credentials and his process. *Louis Vuitton Malletier*, 97 F. Supp. 3d at 504.

Next, Defendants challenge the inputs to Barson's testimony and report, contending that Barson merely reproduced documents provided by Plaintiff without any meaningful analysis.  For example, Defendants suggest that Exhibits 5, 6, and 7 to the Barson Report were drafted by Plaintiff and included at Plaintiff's insistence, due to Plaintiff's "dissatisf[action] with Ms. Archer's deposition testimony."  (Def. MIL Br. 8).  A review of the section of the Barson transcript cited by Defendants, however, indicates the opposite:  Barson testified that each of those exhibits was generated by Plaintiff at *his* request, so that Barson might better understand the Invenias database, the Catalyst IP contained therein, and the ways in which Plaintiff's employees and partners used the database.  (*See* Barson Depo. 52:18-22 (indicating that Exhibit 5 was created after "[Barson] asked [Archer] to provide [him] with an explanation of what happens in the company, how things are done in terms of the functions going into populating the database"), 55:11-16 (indicating that Exhibit 6 was created after "[Barson] asked [Archer] to get a sense of what Invenias looks like … , what the data that it produces looks like in a printed form or on a screen"), 56:20-24 (indicating that Exhibit 7 was created after "[Barson] asked [Archer] to get a better understanding of the roles that [Plaintiff's partners and employees] would play and the percentages of those various roles that would be used in the development of the database")).

Defendants argue separately that these Catalyst-furnished exhibits to Barson's expert report should be excluded as conflicting with Archer's deposition testimony.  However, Defendants are no clearer this time in

identifying how the cited exhibits specifically conflict with Archer's testimony. (Def. MIL Br. 8-9).  Defendants instead merely repeat their generalized objection to Archer's testimony, which the Court has already rejected, and bundle it with citations to the not-in-dispute principle that a Rule 30(b)(6) deponent's testimony binds the entity she is representing.  (*Id.*).  But even assuming, *arguendo*, that Defendants had appropriately objected to Exhibits 5, 6, and 7 to the Barson Report, the Court finds on its own review of those exhibits that Defendants' arguments are overblown.

Exhibit 5 is a Catalyst-authored narrative regarding how the Catalyst IP is created and maintained in the Invenias Database, describing at a more granular level certain facts discussed in Archer's deposition and declaration. (*Compare* Barson Decl., Ex. 5, *with* Archer Depo. 147:23-149:12, *and* Archer Decl. ¶¶ 17-82).  But as it happens, Catalyst does not rely on Exhibit 5 in its Local Rule 56.1 Statement or Counterstatement, nor do citations to Exhibit 5 appear in Catalyst's opposition brief.  The Court will therefore reserve judgment on Defendants' concerns regarding this exhibit until it becomes apparent that Plaintiff intends to use this exhibit at trial.

Exhibit 6 is an "Appendix [of] Screen Shots" of the Invenias database that again supplements, rather than contradicts, Archer's prior testimony.  Most significantly, Exhibit 6 details the format of candidate and company profiles in Invenias, and depicts how the non-public information (*e.g.*, the assignments for which a candidate has been considered historically, the compensation data for successfully-placed candidate) and Catalyst work product (*e.g.*, the master

history of communication between Catalyst and the candidate, the accompanying journal notes those communications, and the candidate summaries and assessment notes prepared by Catalyst)) are blended with the public biographical information about candidates and companies. (*See generally* Barson Rep., Ex. 6).

Finally, Exhibit 7 reflects Catalyst's response to Barson's request that Catalyst provide it with a "better understanding of the roles that [Plaintiff's partners and employees] would play and the percentages of those various roles that would be used in the development of the database." (Barson Depo. 56:20-57:1; Barson Rep., Ex. 7). Like Exhibits 5 and 6, Exhibit 7 supplements, rather than recasts, Archer's deposition testimony and is appropriately appended to the Barson Report, as it provides context for the assumptions underlying Barson's analysis.

Defendants' related argument that Barson's testimony should be excluded because he did not adequately scrutinize the information provided by Plaintiff to determine its accuracy is also unavailing. For starters, Defendants' position is again belied by Barson's testimony to the contrary. (*See, e.g.*, Barson Depo. 58:10-12 (confirming that Barson broadly evaluated Exhibits 1, 2, and 3 for credibility)). Indeed, Barson provided thoughtful testimony explaining his validation of the data provided by Plaintiff concerning the amount of time spent by its partners working on the Catalyst IP contained in the Invenias database. (*See id.* at 25:18-31:12). And as a more general matter, Barson's testimony is not unreliable or inadmissible merely because it relied on

"unverified … information provided by [his] client." *See Scott* v. *Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) (citing *Lee Valley Tools, Ltd.* v. *Indus. Blade Co.*, 288 F.R.D. 254, 267 (W.D.N.Y. 2013)).  Expert witnesses have long been entitled "to rely on facts, opinions, and data developed or prepared by another." *Better Holdco, Inc.* v. *Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 362 (S.D.N.Y. 2023) (quoting *In re M/V MSC Flaminia*, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *5 n.6 (S.D.N.Y. July 28, 2017)). Defendants' "contentions that the assumptions [of Barson's testimony] are unfounded go to the weight, not the admissibility of the testimony." *Zerega Ave. Realty Corp.* v. *Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009).  The Court therefore finds that Defendants have not met their burden to establish that Barson's testimony is clearly inadmissible, and therefore cannot prevail in their motion to limit his testimony.

> ### c.    Kyprianou's Expert Report and Testimony Are Not Clearly Inadmissible

Finally, the Court turns to Kyprianou's expert testimony, which reflected the results of his firm's "forensic examination of four laptops and one USB Thumb drive that belonged to [Plaintiff]" and were used by Defendants. (Kyprianou Rep. 3).  Broadly, Defendants seek exclusion of Kyprianou's testimony, arguing that it "does nothing to aid the trier of fact."  (Def. Reply 16).  While conceding that Kyprianou's testimony establishes "whether certain documents were accessed [by Defendants] and at what time" (*id.* at 16-17), Defendants maintain that the testimony is of no significance because it

"does not opine on whether Defendants *improperly* accessed a Catalyst trade secret" (Def. MIL Br. 12).

Once again, however, Defendants are seeking to raise a merits argument in the guise of a motion *in limine*. Here, the question of whether any access was improper is one for the jury, and not for the Court to address in an evidentiary ruling. As measured against Rule 702(a), Kyprianou's testimony is clearly useful to the jury in making such a determination, insofar as it details the scope of Defendants' access to (and use of) Plaintiff's documents, which details the jury can consider alongside the LPA and other evidence setting out the conditions under which such access was authorized, and the testimony of the parties arguing why such access was proper. In particular, the Kyprianou Report includes several appendices listing specific documents created at or around the dates of Richards's dissociation from Catalyst, including certain documents created at or around Richards's October 4, 2019 date of departure. (*See, e.g.*, Kyprianou Rep., App'x 2 (listing "743 documents that Richards accessed on the [Catalyst] laptop between August 8, 2019 to October 4, 2019"), 3 (listing 71,419 "reparse points ... created on [Richards's] laptop between August 8, 2019 and October 4, 2019"), and 6 (listing "327 documents located in [Richards's] new laptop that were created between August 8, 2019 and October 4, 2019)). The Court finds that Kyprianou's testimony as to the factual conclusions of his forensic examination is both relevant and admissible.

Defendants have a stronger argument with respect to certain of Kyprianou's conclusions about the consequences of Defendants' activities.

(Def. MIL Br. 13).  That is, Kyprianou's testimony is appropriate to the extent that it concludes that certain patterns of activity — *e.g.*, the creation, access, or deletion of files *en masse* — are suspicious in a general sense, given Kyprianou's background in forensic investigation.  The Court will not, however, permit testimony from Kyprianou that concludes, for instance, that there was "no legitimate reason" for the creation of a given document.  (*See, e.g.*, Kyprianou Rep. 15 (concluding that "[t]here [was] no legitimate reason for Richards to create" a list of searches by Arnaldo de Lisio)).  Such normative testimony by Kyprianou about Plaintiff's business operations is outside the scope of his expert knowledge, and is more appropriate testimony for Catalyst's fact witnesses.  *See Hernandez* v. *Leichliter*, No. 14 Civ. 5500 (AJN), 2016 WL 684038, at *2 (S.D.N.Y. Feb. 18, 2016) (excluding testimony where plaintiff's expert "merely repeats or recasts the testimony of [plaintiff] in order to arrive at [his conclusion]" (internal quotation marks and citation omitted)).  In short, Kyprianou may properly testify to his expert conclusion that a given document or set of documents was created, but Catalyst's percipient witnesses will have to dispute its significance at trial.

Similarly, Kyprianou may testify regarding his forensic findings that Defendants accessed certain filesharing sites and connected portable storage devices to Catalyst computers, and that it was theoretically possible for files to have been exfiltrated from Catalyst's systems via those channels.  (*See, e.g.*, Kyprianou Rep. 16-17 (reporting that Richards connected several USB mass storage devices to his laptop, and accessed numerous cloud storage platforms

during his time at Catalyst)).  Beyond the mere facts regarding access, however, the Court will not permit Kyprianou to speculate as to whether Defendants misappropriated assets via exfiltration.  *See Daubert*, 509 U.S. at 590 (noting that expert opinions that reflect "subjective belief or unsupported speculation" must be excluded).  To be clear, however, Defendants' concerns of this nature are more apparent than real, as Kyprianou's statements to date have focused on whether Defendants had the opportunity to misappropriate documents, and not whether Defendants did so.  (*See, e.g.*, Kyprianou Report 32-33 (concluding that Richards, Bartholomew, and Thelluson each "had access to and the ability to copy Catalyst files to third party electronic sources in [their] possession, custody[,] and control")).

Finally, Defendants assert that Kyprianou, like Barson, merely "acts as a mouthpiece for Catalyst on facts alleged in Catalyst's Complaint that should have been developed in discovery and explained through Catalyst's corporate designee at its Rule 30(b)(6) deposition."  (Def. MIL Br. 14).  On this issue, Defendants suggest that Kyprianou's testimony "impermissibly mirrors the testimony offered by fact witnesses, [and that] the subject matter of [Kyprianou's] testimony is not beyond the ken of the average juror.  (*Id.* (quoting *United States* v. *Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994))).  In so arguing, however, Defendants ignore the fact that the primary value of Kyprianou's testimony is its forensic evidence of Defendants' access to Plaintiff's systems.  Moreover, as with the exhibits to the Barson Report, the

Catalyst-authored components of Kyprianou's testimony are not part of the record that this Court is considering at summary judgment.

In sum, Defendants have not met their burden to justify that the challenged Archer, Barson, and Kyprianou statements should be excluded. While Defendants are entitled to argue that the evidence adduced by each witness leaves Plaintiff short of the mark with respect to the various elements of its trade secrets claims, these arguments concern the merits of the case and do not provide a basis for excluding the testimony of the witnesses.  As trial draws closer in this matter, and the universe of relevant evidence and testimony becomes clearer, Defendants may renew certain motions *in limine*, though they are advised of their obligation to provide specific citations to the record, and not merely rest on generalized objections grounded in erroneous characterizations of a witness's testimony or the evidentiary value of a document.

## B. Genuine Disputes of Material Fact Preclude Summary Judgment as to Nearly All of Plaintiff's Claims

Having resolved Defendants' motions *in limine*, the Court proceeds to consider Defendants' motion for summary judgment as to Plaintiff's claims for violation of the DTSA and common-law misappropriation of trade secrets, as well as Plaintiff's claims for breach of the LPA.  For the reasons discussed herein, the Court denies summary judgment as to each claim, with one limited exception.

### 1.    Motions for Summary Judgment Under Rule 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322 (1986).[10]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted).  The nonmoving party may

---

[10]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### 2.   The Court Denies Summary Judgment as to Plaintiff's Misappropriation Claims

The Court begins with Plaintiff's federal and common-law claims for misappropriation of trade secrets.[11] On this topic, Defendants argue that Plaintiff can neither establish that it possessed a trade secret, nor demonstrate that Defendants misappropriated any trade secret, nor show any damages from any allegedly misappropriated trade secret. The Court addresses each argument in turn.

### a.   Applicable Law

"The DTSA provides a private right of action for '[a]n owner of a trade secret that is misappropriated ... if the trade secret is related to a product or

---

[11]   In their briefing, the parties do not address any differences between claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839, and those under New York common law. As the elements for liability under both overlap almost entirely, courts have analyzed both sets of claims in tandem at the summary judgment stage. *See, e.g.*, *Better Holdco, Inc.* v. *Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 395 (S.D.N.Y. 2023) ("Because the elements for a misappropriation claim under New York law are fundamentally the same as a DTSA claim, the Court's holding that [a defendant] is not entitled to summary judgment as to liability on [a plaintiff's] DTSA claim ... applies equally to [plaintiff's] misappropriation claim." (internal quotation marks and citation omitted)). Consistent with the arguments presented by the parties, this Court adopts the same approach.

service used in, or intended for use in, interstate or foreign commerce.'" *Zabit* v. *Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (quoting 18 U.S.C. § 1836(b)(1)).  To prevail on its claim for trade secret misappropriation under the DTSA, a plaintiff must prove that "[i] it possessed a trade secret, and [ii] the defendant misappropriated the trade secret." *Democratic Nat'l Comm.* v. *Russian Federation*, 392 F. Supp. 3d 410, 447 (S.D.N.Y. 2019) (internal quotation marks omitted); *Syntel Sterling Best Shores Mauritius Ltd.* v. *TriZetto Grp.*, No. 15 Civ. 211 (LGS) (SDA), 2020 WL 1442915, at *8 (S.D.N.Y. Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 1911205 (S.D.N.Y. Apr. 20, 2020).  Under New York law, the elements are practically identical. *See Integrated Cash Mgmt. Servs. Inc.* v. *Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) ("A plaintiff claiming misappropriation of a trade secret [under New York law] must prove: [i] it possessed a trade secret, and [ii] defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." (internal quotation marks omitted)).

With respect to the first element of a DTSA claim, the statute defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," so long as: (i) "the owner thereof has taken reasonable measures to keep such information secret" and (ii) "the information derives independent economic value, actual or

potential, from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain

economic value from the disclosure or use of the information."  18 U.S.C.

§ 1839(3); *see also Zabit*, 540 F. Supp. 3d at 421.  New York courts consider

the following factors in determining whether information qualifies as a trade

secret under the DTSA and/or New York law:

> [i] the extent to which the information is known outside
> of [the] business; [ii] the extent to which it is known by
> employees and others involved in [the] business; [iii] the
> extent of measures taken by [the business] to guard the
> secrecy of the information; [iv] the value of the
> information to [the business] and to [its] competitors;
> [v] the amount of effort or money expended by [the
> business] in developing the information; [vi] the ease or
> difficulty with which the information could be properly
> acquired or duplicated by others.

*Integrated Cash*, 920 F.2d at 173.

"The existence, *vel non*, of a trade secret usually is treated as a question

of fact," and properly within the province of the jury.  *Chevron U.S.A., Inc.* v.

*Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987); *accord Town & Country Linen*

*Corp.* v. *Ingenious Designs LLC*, 556 F. Supp. 3d 222, 274 (S.D.N.Y. 2021);

*Syntel Sterling*, 2020 WL 1442915, at *9.  Still, summary judgment may be

appropriate "where it is clear that the information at issue is not actually secret

or there is no discernible economic value from that information not being

generally known." *Better Holdco*, 666 F. Supp. 3d at 384 (quoting *Catalyst*

*Advisors*, 602 F. Supp. 3d at 672 (addressing the propriety of granting a motion

to dismiss a DTSA claim)).

As to the second element, the DTSA defines "misappropriation" to include (i) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," and (ii) "disclosure or use of a trade secret of another without express or implied consent by a person who," *inter alia*, "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was ... derived from or through a person who had used improper means to acquire the trade secret." 18 U.S.C. § 1839(5). "'Improper means' includes 'theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy,' but excludes 'reverse engineering, independent derivation, or any lawful means of acquisition.'" *Town & Country*, 556 F. Supp. 3d at 255 (quoting 18 U.S.C. § 1839(6)). As noted above, the standard is practically identical under New York law, which provides that misappropriation arises from "us[e] [of] that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash*, 920 F.2d at 173.

Both the DTSA and New York law "therefore contemplate[] three theories of liability [for misappropriation]: [i] acquisition, [ii] disclosure, or [iii] use." *Better Holdco*, 666 F. Supp. 3d at 389 (internal quotation marks omitted) (citing *AUA Priv. Equity Partners, LLC.* v. *Soto*, No. 17 Civ. 8035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018)).

### b. A Reasonable Jury Could Conclude That the Catalyst IP Constitutes a Trade Secret

Whether or not a trade secret exists requires a twofold analysis. First is the question of specificity, under which "the party opposing summary judgment must be able to identify the alleged trade secret with sufficient specificity to make the moving party aware of what information it has allegedly misappropriated." *Next Commc'ns, Inc.* v. *Viber Media, Inc.*, 758 F. App'x 46, 49 (2d Cir. 2018) (summary order). "The specificity requirement 'places a defendant on notice of the bases for the claim being made against it,' and allows a factfinder to determine whether certain information is, in fact, a trade secret." *Syntel Sterling Best Shores Mauritius Ltd.* v. *The TriZetto Grp., Inc.*, 68 F.4th 792, 801 (2d Cir.) (quoting *Oakwood Labs. LLC* v. *Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021)), *cert. denied*, 144 S. Ct. 352 (2023). Provided a party has cleared that hurdle, it must then establish that the putative trade secret possesses the attributes of a trade secret under the DTSA and New York law, considering the six factors enumerated in *Integrated Cash*. *See* 920 F.2d at 173 (citation omitted).

### i. The Catalyst IP Is Sufficiently Specific to Constitute a Putative Trade Secret

On the threshold issue of specificity, the parties disagree as to the scope of materials that could suffice to constitute a trade secret in this action. Plaintiff maintains, consistent with its allegations in the complaint, that the trade secret in this matter is the "Catalyst IP" contained in the company's Invenias and SharePoint databases. (Pl. Opp. 4 (citing Pl. 56.1 ¶ 28)).

45

Additionally, Plaintiff asserts that the Immatics List and Atkins List are both trade secrets, inasmuch as both documents were derived from the Catalyst IP contained in the Invenias repository.  (*Id.* at 22).  Defendants, in contrast, argue that the Catalyst IP is too amorphous to constitute a trade secret, and principally focus their arguments on the Immatics and Atkins Lists.  This approach is particularly apparent in Defendants' reply, where Defendants eschew addressing any of the substantive arguments made by Plaintiff that the Catalyst IP is a trade secret.  (Def. Reply 1).  Indeed, Defendants concede that "[f]or the purposes of these motions, Defendants do not contend that Invenias does not contain some protectable trade secrets."  (*Id.*).

Defendants instead assert that "Plaintiff has not identified any Rule 56 competent evidence that Defendants possessed anything but publicly known information that may have also resided on its Invenias database."  (Def. Reply 1-2).  This position, however, rests on Defendants' conclusory premise that the Archer Declaration is a sham affidavit, which premise the Court has already rejected in its discussion of Defendant's motions *in limine*.  As the Archer Declaration is properly within the scope of materials that can be considered at summary judgment, the Court will evaluate Plaintiff's definition of trade secrets as contained in its Rule 56.1 Statement.

While the Second Circuit has not yet articulated a general specificity rule, its analysis focuses on whether "a reasonable jury could have determined the asserted trade secrets were in fact trade secrets."  *Syntel Sterling*, 68 F.4th at 801; *see also Sit-Up Ltd.*, 2008 WL 463884, at *11 ("[S]pecificity is

required … so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation.").  Turning back to the record, the Court finds that Plaintiff has defined the Catalyst IP with adequate specificity.  *First*, the Archer Declaration attests to the general characteristics of the Catalyst IP as a unified body of non-public documents and information, generated by its recruiting professionals in the course of their daily activities, and contained within Invenias.  (Archer Decl. ¶¶ 17-82).  *See, e.g.*, *Medidata Sol., Inc.* v. *Veeva Sys., Inc.*, No. 17 Civ. 589 (LGS), 2021 WL 467110, at *4 (S.D.N.Y. Feb. 9, 2021) (considering plaintiff's sworn affidavit containing a narrative description of the trade secrets, and finding such narrative description sufficient to describe trade secrets at the summary judgment stage); *ScentSational Techs., LLC* v. *PepsiCo, Inc.*, No. 13 Civ. 8645 (KMK), 2017 WL 4403308, at *10 (S.D.N.Y. Oct. 2, 2017) (finding plaintiff's "75-paragraph declaration with citations to specific documents that support Plaintiff's claim" sufficient to support its theory of "claimed combination trade secrets" for the purposes of summary judgment).

*Second*, Plaintiff identifies a subset of constituent documents within the Catalyst IP that were allegedly accessed in a suspicious manner by Defendants.  (*See* Kyprianou Rep. 14-16).  For example, the Kyprianou Report identifies various "Office documents and zip files" that Defendants had no reason to access, including

- "[i]nternal Catalyst documents";
- "[documents] related to searches that Richards did not work on, including zip and Word documents that he

> created on October 4, 2019, the day [Richards] resigned from Catalyst";
>
> ▪ "zip files containing … confidential CVs shared with Catalyst by each candidate and vetted and formatted by Catalyst before being presented to a client"; and
>
> ▪ "documents of Status Memos or Status Reports (also called Progress Reports) for searches [Richards] was not working on … contain[ing] information about all of the candidates presented during the course of [a search] project and [] sent to the client each week."

(*Id.* at 14-15). Further attached to the Kyprianou Report are appendices listing the specific constituent documents, thereby narrowing the documents within the Catalyst IP that are at issue in the litigation. (*See, e.g.*, Kyprianou Rep., App'x 2 (listing "743 documents that Richards accessed on the [Catalyst] laptop between August 8, 2019 to October 4, 2019"), 3 (listing 71,419 "reparse points … created on [Richards's] laptop between August 8, 2019 and October 4, 2019), 6 (listing "327 documents located in [Richards's] new laptop that were created between August 8, 2019 and October 4, 2019")).

With these parameters, a reasonable jury could understand and evaluate Plaintiff's position that the Catalyst IP comprised a set of "proprietary information [that] includes, among other things, resumes, curricul[a] vitae, proposal letters, contracts, progress reports, notes from client update calls and discussions with candidates, offer letters, references, and other Catalyst internal documents." (Pl. Opp. 3; *accord* Pl. 56.1 ¶ 6). While a reasonable jury might ultimately conclude, based on the applicable factors, that such a set of materials does not constitute a trade secret, the Court is confident that such a jury would be capable of considering the databases and applicable law to

determine *whether* the proffered information constitutes a trade secret. *See Integrated Cash*, 920 F.2d at 173.

Indeed, other courts have found analogous databases to constitute protectable trade secrets. Most notably, the United States Court of Appeals for the Ninth Circuit, in *United States* v. *Nosal*, found that a database named "Searcher," which was maintained by Korn/Ferry, a global executive search firm similar to Plaintiff, constituted a trade secret within the meaning of 18 U.S.C. § 1839(3). 844 F.3d 1024, 1042 (9th Cir. 2016). There, as here, the trade secret at issue was "an internal database of information on over one million executives, including contact information, employment history, salaries, biographies and resumes, all compiled since 1995." *Id.* at 1030. (*See* Pl. 56.1 ¶ 16 ("The Catalyst IP within Catalyst's Invenias database represents the accumulation, creation, and analysis over a decade of data and documents generated by Catalyst's limited partners and employees regarding its target industry …, Catalyst's clients, the universe of executive candidates, and the search projects Catalyst has conducted.")). And in finding that the database was a trade secret, the Ninth Circuit acknowledged "the principle that a trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources." *Id.* at 1042; *see also Imperial Chem. Indus. Ltd.* v. *Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965) (restating "the general principle that a trade secret can exist in a combination of characteristics and components … the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a

protected secret"). Accordingly, the Court finds that Plaintiff has described the Catalyst IP with sufficient specificity.

### ii. Plaintiff Has Provided Sufficient Evidence That the Catalyst IP Contains the Attributes of a Trade Secret

The Court next considers whether a reasonable jury could conclude that the Catalyst IP contains the necessary attributes to qualify as a trade secret under the DTSA. Rather than address each of the six factors enumerated in *Integrated Cash*, Defendants instead advance three general arguments that cover all factors. *See Integrated Cash*, 920 F.2d at 173; *cf. LivePerson, Inc.* v. *24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015) (observing that the "[*Integrated Cash*] factors are guideposts, not elements, and it is not necessary to plead every single factor to state a claim"). (Def. MSJ Br. 8-12). These arguments are as follows: *first*, the purported trade secrets contain public information; *second*, Plaintiff has not taken reasonable measures to protect its purported trade secrets; and *third*, there is no evidence of the effort or money expended by Plaintiff in developing its purported trade secrets, and thus no evidence of their value to Plaintiff or its competitors. (*Id.*). Ultimately, Defendants fail to meet their burden on each issue.

### (a) The Catalyst IP Contains Non-Public Information

"For a plaintiff to claim entitlement to trade secret protection, 'the subject matter of a trade secret must be secret.'" *Town & Country Linen*, 556 F. Supp. 3d at 258 (quoting *Speedry Chem. Prods., Inc.* v. *Carter's Ink Co.*, 306

F.2d 328, 331 (2d Cir. 1962)).  As noted above, "[f]or the purposes of these motions, Defendants do not contend that [the] Invenias [database] does not contain some protectable trade secrets."  (*Id.*).  Nor could they, as the evidence in the record clearly establishes that the Catalyst IP incorporates a significant amount of non-public information.  For one thing, the Catalyst IP collates an array of non-public documents, such as *curricula vitae,* and information, such as compensation expectations, provided to Plaintiff by its clients and target candidates in reliance on Plaintiff's guarantees of confidentiality.  (Pl. 56.1 ¶¶ 29, 38).  Furthermore, the Catalyst IP contains a range of work product generated by Plaintiff, including internal notes of meetings with clients, summaries of interviews, and candidate impressions of clients, which work product reflects the specific preferences of both Catalyst's client companies and target candidates.  (*Id.* ¶¶ 44-48).  Accordingly, the Court finds sufficient evidence in the record that the Catalyst IP contains non-public information to preclude summary judgment on this issue.

### (b)   Plaintiff Has Taken Reasonable Measures to Protect the Catalyst IP

Moving on, "[i]t is axiomatic that a plaintiff cannot recover for the misappropriation of a trade secret if he revealed that secret" to the world. *Broker Genius, Inc.* v. *Zalta*, 280 F. Supp. 3d 495, 518 (S.D.N.Y. 2017). "Although absolute secrecy is not required, a trade secret must be veiled in sufficient secrecy that except by use of improper means, there would be difficulty in acquiring the information." *Town & Country*, 556 F. Supp. 3d at

258 (alteration adopted) (internal quotation marks and citation omitted).

Accordingly, "for information to constitute a 'trade secret' under the DTSA, a

plaintiff must have 'taken reasonable measures to keep such information

secret.'" *Better Holdco*, 666 F. Supp. 3d at 385 (quoting 18 U.S.C.

§ 1839(3)(A)).

The Second Circuit has yet to construe the term "reasonable measures"

for purposes of the DTSA in a precedential opinion. *See Xavian Ins. Co.* v.

*Marsh & McLennan Cos.*, No. 18 Civ. 8273 (DLC), 2019 WL 1620754, at *4

(S.D.N.Y. Apr. 16, 2019). "But given that trade secrets may appear in a wide

variety of 'forms and types,' 'what measures are reasonable' must depend in

significant part on the nature of the trade secret at issue." *Turret Labs USA,*

*Inc.* v. *CargoSpirit, LLC*, No. 21-952, 2022 WL 701161, at *2 (2d Cir. Mar. 9,

2022) (summary order) (alteration adopted) (first quoting 18 U.S.C. § 1839(3),

and then quoting *Exec. Trim Constr., Inc.* v. *Gross*, 525 F. Supp. 3d 357, 380

(N.D.N.Y. 2021)). Thus, the "reasonableness" of any protective measure is a

case-specific inquiry and a question of fact.

In this case, the record contains evidence of both practical and

contractual measures implemented by Plaintiff to protect the Catalyst IP. As to

the former, it is undisputed that access to Invenias and SharePoint, on which

the Catalyst IP was maintained, was limited to Plaintiff's limited partners and

employees in possession of an authorized username and password. (Def. Opp.

56.1 ¶ 62). Plaintiff also maintained additional restrictions on the Catalyst IP

within the Invenias database, including limits on which parties were permitted

to export information from the database.  (Archer Depo. 172:4-23).  Likewise, there is evidence that Plaintiff maintained confidentiality obligations in connection with the Catalyst IP, namely in its LPA and Employee Handbook, and in non-disclosure agreements for third-party contractors doing business with Plaintiff.  (Pl. 56.1 ¶¶ 63, 65-66).  Such "procedural, technical[,] and physical measures" to safeguard the Catalyst IP are "precisely the types of measures which courts have held are sufficiently reasonable to withstand a motion to dismiss or a motion for summary judgment." *Better Holdco*, 666 F. Supp. 3d at 385-86 (quotation marks omitted) (collecting cases).

To rebut this evidence, Defendants principally argue that the Catalyst IP was left unprotected as a practical matter, inasmuch as Defendants could circumvent the limited permissions on their Invenias credentials by asking Plaintiff's employees with permission to export and send them information that they could not otherwise download from the Invenias database.  (Def. MSJ Br. 9-10).  Defendants further maintain that nothing in the LPA, Employee Handbook, employment agreement, or other non-disclosure agreements prevented a Catalyst employee or partner from accessing the Catalyst IP during the course of their employment.  (Def. MSJ Br. 10).  Defendants' arguments, however, fall squarely into the category of factual disputes, and are insufficient to establish, as a matter of law, that Plaintiff's protective measures were unreasonable.  *See Better Holdco*, 666 F. Supp. 3d at 385 ("[T]o defeat a motion for summary judgment, a plaintiff need only point to evidence of protective

measures, and then it becomes the jury's task to evaluate whether they were reasonable." (citing *Town & Country*, 556 F. Supp. 3d at 266-67)).

> ### (c)    The Catalyst IP Is the Product of Effort and Has Value to Plaintiff and Its Competitors

The Court considers in tandem Defendants' two remaining arguments: that there is no evidence of the effort or money Plaintiff expended in developing the Catalyst IP; and that there is no evidence to support the Catalyst IP's value to Plaintiff or its competitors.  (Def. MSJ Br. 10-12).  Once again, Defendants' arguments presuppose success with their motions *in limine*, in that they rest principally on Defendants' arguments that Plaintiff's interrogatory responses on both topics were impermissibly broad, and that Plaintiff cannot introduce testimony through Barson or Archer to demonstrate the value of the Catalyst IP.  (*See id.*).  As the Court has found both Barson's and Archer's testimony to be admissible for the purposes of the instant motion, Defendants' arguments on this topic largely fall away.  (*See supra* Sections A.2.a and A.2.b).

To begin, it is evident from Plaintiff's description of the process by which the information comprising the Catalyst IP is acquired, collated, and maintained in the Invenias database that the Catalyst IP is the product of a considerable expenditure of effort.  (*See* Pl. 56.1 ¶¶ 21-60).  Moreover, Defendants' specific objections to the contrary rely principally on testimony by Richards and CAIG, who each represented that they did not input notes into Invenias.  (Def. Opp. 56.1 ¶ 10 (citing Richards Depo. 66:6-67:9; Bartholomew Depo. 123:25-124:18, 210:7-16)).  This testimony, however, at best creates a

dispute of fact, and does not rebut Plaintiff's representation that other partners and employees *did* input notes into Invenias, thereby growing the body of Catalyst IP contained within the database.  Barson's expert analysis of the dollar-value equivalent of this effort only buttresses Plaintiff's assertion that the Catalyst IP has an independent market value.  (*See* Barson Rep. 3-4 (concluding that, during the six-year period covered by the report, "Catalyst expended $42,270,174 relevant to the development/expansion of its database," and that, on average, each entry in the database "cost Catalyst $1,055.49")).  *See Iacovacci* v. *Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (considering "the amount of effort or money expended by the business in developing the information" as a "guidepost[ ]" for identifying trade secrets (internal quotation marks and citations omitted)).

Ultimately, drawing all inferences and resolving all disputes of material fact in Plaintiff's favor, the Court finds that a reasonable jury could conclude that the Catalyst IP, as contained on the Invenias and SharePoint databases, constitutes a protectable trade secret under the DTSA and New York law.  As discussed above, Plaintiff has adduced sufficient evidence to establish that the Catalyst IP contains a body of client- and candidate-specific information developed through Plaintiff's own diligence, subject to reasonable protections implemented by Plaintiff, and not known or easily obtainable outside of the Plaintiff's business.  Plaintiff has likewise established that the Catalyst IP had value to Plaintiff and its competitors.  *Accord Integrated Cash*, 920 F.2d at 173 (setting forth the factors for determining a trade secret under federal and New

York law).  The Court therefore denies Defendants' motion for summary judgment on those grounds.

### iii.   The Immatics List and the Atkins List May Also Qualify as Trade Secrets

Separately, Defendants take issue with the Atkins and Immatics Lists, asserting that both "[l]ists only contain publicly available contact information," and therefore cannot be considered trade secrets.  (Def. Reply 1, 8-9; *see also* Def. MSJ Br. 8).  In particular, Defendants argue that the Atkins and Immatics Lists are akin to customer lists, which "[u]nder Second Circuit precedent … may be treated as a trade secret … provided the information [the lists] contain[] is not otherwise readily ascertainable."  *Free Country Ltd.* v. *Drennen*, 235 F. Supp. 3d 559, 566 (S.D.N.Y. 2016) (internal quotation marks omitted) (citing *N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 46 (2d Cir. 1999)).  In support of their argument, however, Defendants focus entirely on the public nature of the data fields contained on the lists themselves, and fail to address the broader, more important question of whether the universe of entities comprising each list was itself "ascertainable outside the employer's business … or, by contrast, … discoverable only by extraordinary efforts."  *Poller* v. *BioScrip, Inc.*, 974 F. Supp. 2d 204, 216 (S.D.N.Y. 2013) (internal quotation marks omitted).

On that issue, Plaintiff correctly argues that, for the purposes of summary judgment, the record reflects sufficient facts that the tailored nature of the lists, reflecting various non-public data fields and filtering options of the Catalyst IP contained in Invenias, renders those lists not readily ascertainable

outside of Plaintiff's business.  (*See* Pl. Opp. 22).  *See Haber*, 188 F.3d at 46 ("Numerous cases applying New York law have held that where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply." (collecting cases)); *see also A.F.A. Tours, Inc.* v. *Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991) ("The question of whether or not a customer list is a trade secret is generally a question of fact.").  Indeed, CAIG has acknowledged as much with respect to the tailored nature of the Immatics List, testifying that it intended to use the List to "win a pitch to do a search to get a chief medical officer for Immatics." (Bartholomew Depo. 131:21-22).  As CAIG put it, the Immatics List offered a distinct competitive advantage, as it represented a "great list … of chief medical officers" with whom CAIG was already familiar, and including non-public information regarding those executives, such as compensation information. (*Id.* at 131:23-132:2 ("When I spoke to the CEO I wanted to be able to say … I've got this great list in front of me of chief medical officers … look, we know so and so is paid so and so at that place, you know, [etc.].")).

Relevantly, the Ninth Circuit in *Nosal* reached the same conclusion with respect to "'source list[s]' of potential candidates" generated by Korn/Ferry teams "[w]hen launching a new search to fill an open executive position." 844 F.3d at 1030.  There, as here, the Court considered an argument that "the source lists [were] composed largely, if not entirely, of public information and therefore couldn't possibly be trade secrets."  *Id.* at 1042.  And there, as here, the Court rejected the argument, finding that the source lists were "classic

examples of a trade secret that derives from an amalgam of public and propriety source data" contained in the Searcher database. *Id.* In particular, the Court recognized that "[e]ach source list was the result of a query run through a propriet[ary system] that generat[ed] a custom subset of possible candidates, culled from a database of over one million executives." *Id.* Put differently, the *Nosal* Court observed that the tailored nature of these source lists rendered them not readily ascertainable, and therefore were properly considered trade secrets. *Id.* ("The source lists were not unwashed, public-domain lists of all financial executives in the United States, nor otherwise related to a search that could be readily completed using public sources.").

Defendants are of course free to argue to the jury that the searches run by Plaintiff resulting in the Atkins and Immatics Lists were not so sophisticated as to render the lists not readily ascertainable, and therefore not protected trade secrets. At this juncture, however, sufficient facts exist to support the contrary finding, *i.e.*, that both lists, like the Catalyst IP, reflect non-public information sufficient to render them trade secrets.

### c.   Disputes of Material Fact Remain as to Whether Defendants Misappropriated the Catalyst IP

Having found that Plaintiff has identified triable issues concerning whether the Catalyst IP, and the Atkins and Immatics Lists drawn therefrom, constitute protectable trade secrets, the Court next considers Defendants' fallback argument that the record cannot support a finding of misappropriation by either Defendant. The DTSA defines "misappropriation" as the "acquisition

of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or the "disclosure or use of a trade secret of another without express or implied consent" in specified circumstances.  *See* 18 U.S.C. § 1839(5).  "Improper means" under the DTSA includes "breach or inducement of a breach of a duty to maintain secrecy." *See id.* § 1839(6).  As noted, the statute "contemplates three theories of liability: [i] acquisition, [ii] disclosure, or [iii] use."  *Better Holdco*, 666 F. Supp. 3d at 389 (internal quotation marks omitted) (citing *AUA Private Equity Partners, LLC*, 2018 WL 1684339, at *4).

Defendants maintain that summary judgment is appropriate on each theory of liability, though they focus primarily on acquisition.  (Def. MSJ Br. 12-16).  As elaborated herein, however, the Court finds triable issues as to whether Richards or CAIG, or both, misappropriated the Catalyst IP.

### i.   A Reasonable Juror Could Find That Richards Misappropriated the Catalyst IP

Beginning with Richards, Defendants contend that summary judgment is appropriate because Plaintiff cannot identify any facts affirmatively indicating that Richards improperly acquired the Catalyst IP through exfiltration from Catalyst's network.  (Def. MSJ Br. 12-14; Def. Reply 6).  While Defendants are correct that they "need not prove a negative" to prevail on a summary judgment motion, and "need only point to an absence of proof on plaintiff's part" to carry their initial burden, *Parker* v. *Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001), their argument ignores the well-established principle that

"circumstantial evidence [] may be used to prove misappropriation" at the summary judgment stage, *Medidata Solution, Inc.*, 2021 WL 467110, at *11.

Indeed, courts have acknowledged that in most trade secret cases "misappropriation and misuse can rarely be proved by convincing direct evidence." *Q-Co Indus., Inc.* v. *Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985). As was observed by the court in *Q-Co Industries*, "plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince [her] that it is more probable than not that what plaintiff[] allege[s] happened did in fact take place." 625 F. Supp. at 618 (quoting *Greenberg* v. *Croydon Plastics Co. Inc.*, 378 F. Supp. 806, 814 (E.D. Pa. 1974)).[12] "Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything." *Id.*

Such is the case here. For starters, Plaintiff proffers the findings laid out in the Kyprianou Report, which findings detail patterns of access to materials that Plaintiff maintains were outside the scope of Richards's work at or around the time of his departure. (Pl. Opp. 30). Among other things, the Kyprianou

---

[12]    Defendants are incorrect in arguing that *Q-Co Industries* is irrelevant to the Court's summary judgment analysis because that case arose in the context of a motion for a preliminary injunction. (Def. Reply 9 n.2). After all, the *Q-Co Industries* court's observation that a plaintiff may utilize circumstantial evidence to demonstrate a likelihood of success on the merits is just as relevant to this Court's analysis of whether Plaintiff here has proffered sufficient evidence to support a jury's verdict in its favor at trial. More significantly, numerous other courts have cited *Q-Co Industries* at the summary judgment stage. *See, e.g.*, *Parchem Trading, Ltd.* v. *DePersia*, No. 17 Civ. 1618 (KMK), 2020 WL 764211, at *11 (S.D.N.Y. Feb. 14, 2020); *ScentSational Techs., LLC* v. *PepsiCo, Inc.*, No. 13 Civ. 8645 (KMK), 2017 WL 4403308, at *13 (S.D.N.Y. Oct. 2, 2017); *Stanacard, LLC* v. *Rubard, LLC*, No. 12 Civ. 5176 (CM), 2016 WL 462508, at *19-20 (S.D.N.Y. Feb. 3, 2016); *Linkco, Inc.* v. *Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 237838, at *3-4 (S.D.N.Y. Feb. 19, 2002).

Report identifies a universe of 327 documents, a subset of which Plaintiff asserts concern searches for matters that Richards had either not worked on, or were outside the scope of his work at the time of his dissociation. (Kyprianou Report 14, 32). The Kyprianou Report notes that several documents within this subset were "zip and Word documents that [Richards] created on October 4, 2019, the day he resigned from Catalyst." (*Id.* at 14). While it is undisputed that Richards was authorized to access those materials while he was a limited partner at Catalyst, Plaintiff maintains that Richards's interaction with these files so close to his departure from Catalyst is evidence that he intended to take these materials with him after dissociating from the firm, in violation of the confidentiality provision of the LPA. (Pl. Opp. 29-33). *Cf. Cutera, Inc.* v. *Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1207-08 (E.D. Cal. 2020) (finding forensic report indicating that former employees copied files and folders *en masse* at or near the time of their departure to "strongly suggest[] they intended to use the information in their [subsequent] employment," and therefore to support a showing that plaintiff had a likelihood of success on the misappropriation element of its trade secrets claim).

Plaintiff bolsters this theory by demonstrating that Richards had the means to misappropriate these files, either through exfiltration via cloud software or physical hard drives. Indeed, Plaintiff notes that Defendants did not supply it with every device that Richards connected to Catalyst's systems prior to his departure, and that two of the USB devices provided by Richards contained Catalyst IP files that had been copied from a non-Catalyst device

possessed by Richards and not turned over in discovery.  (Pl. Opp. 32 (citing Kyprianou Rep. 10-16, 32)).[13]  Finally, Plaintiff argues that Richards's intent to use Plaintiff's confidential material to aid him in his future employment, in violation of his duties under the LPA, is supported by the evidence suggesting that Richards diverted at least one prospective client from Catalyst to his subsequent employer, in violation of the LPA's non-compete clause.  (*Id.* (citing Richards Depo. 197:1-8; Matalon Decl., Ex. 5, 6)).

Accordingly, Richards's objections as to Plaintiff's evidence (or lack thereof) of his exfiltration of the Catalyst IP from Plaintiff's systems to his personal systems implicate a dispute of material fact, and cannot foreclose Plaintiff's theory as a matter of law.  And construing this evidence in the light most favorable to Plaintiff as the non-moving party, the Court finds that it would allow a reasonable jury to conclude, at a minimum, that misappropriation via acquisition had occurred, given Richards's allegedly suspicious activity in the leadup to his departure from Catalyst and his alleged diversion of business from Catalyst thereafter.  *Cf. Electro-Miniatures Corp.* v. *Wendon Co., Inc.*, 771 F.2d 23, 26 (2d Cir. 1985) (affirming jury verdict finding

---

[13]     Specifically, Kyprianou's forensic findings indicate that files contained on the USB devices may have been copied from a non-Catalyst device, providing circumstantial evidence that at some point those files were copied from a Catalyst device to that non-Catalyst device in the first instance.  (Kyprianou Rep. 27-28 (noting that the devices are "evidence that the data had to have originated from some other source, such as a cloud-based storage account or other devices [in Richards's possession] that Catalyst does not have custody or control over")).  Of note, Defendants' rebuttal expert "concur[s] with [Kyprianou's] assessment that this fact pattern is abnormal," though it maintains that Kyprianou's conclusion regarding the origination of the data "is an unreasonable and illogical forensic leap."  (Silverman MSJ Decl., Ex. 4 (Kroll Expert Report) at 23-24).

misappropriation of trade secrets, where "[t]he circumstantial evidence of misappropriation [was] substantial").

> ii.   **CAIG's Use of the Atkins List, But Not the Immatics List, Could Support a Finding of Misappropriation**

Defendants likewise maintain that summary judgment is appropriate as to CAIG, arguing that the facts establish that CAIG neither misappropriated Plaintiff's trade secrets via exfiltration from Plaintiff's systems, nor misappropriated Plaintiff's trade secrets by disclosure or use in violation of a duty to maintain secrecy.  (Def. MSJ Br. 12-15).  Plaintiff objects, maintaining that the record establishes, at a minimum, that (i) CAIG impermissibly created and used the Atkins List in violation of the LPA, and (ii) CAIG impermissibly retained the Immatics List upon its dissociation from the firm.  (Pl. Opp. 29-30).

Defendants' arguments regarding CAIG have slightly more traction, since Kyprianou found only that CAIG would have been able to misappropriate data, without identifying patterns of suspicious activity akin to those associated with Richards.  (Def. MSJ Br. 13-14; *see* Pl. 56.1 ¶¶ 112-115).  *See Ad Lightning Inc. v. Clean.io, Inc.,* No. 19 Civ. 7367 (JPO), 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020) (dismissing DTSA claims where plaintiff merely alleged that former employees had access to trade secret information, but "alleg[ing] no facts to suggest that the employees actually acquired the information through improper means").  That said, Plaintiff does not rely solely on the Kyprianou Report in its opposition to Defendants' motion.  Rather, Plaintiff maintains that

the undisputed facts establish that CAIG misappropriated the Atkins List,
generated from Catalyst IP contained in the Invenias database, by using the
List to complete the Atkins Search through Bartholomew Advisors.  (Pl. 56.1
¶¶ 91-102).  Similarly, Plaintiff contends that CAIG misappropriated the
Immatics List by retaining a physical copy of the list upon dissociation from
Catalyst.  (*Id.* ¶¶ 104-111)

Beginning with the Atkins List, the Court finds that Plaintiff's theory of
misappropriation is supported by the evidence.  Email correspondence between
Thelluson and Bartholomew indicates that the Atkins List was prepared at
Catalyst by a Catalyst employee, and then sent from Catalyst to Bartholomew
Advisors in connection with Bartholomew Advisors undertaking the Atkins
Search.  (*See* Matalon Decl., Ex. 8).  On Plaintiff's version of the facts, CAIG's
undertaking of the Atkins Search through Bartholomew Advisors was a
violation of the LPA, and Bartholomew's email correspondence with Archer
regarding the Atkins engagement is actually evidence of Bartholomew's attempt
to divert the search from Plaintiff.  (Pl. Opp. 13, 30).

Unsurprisingly, Defendants dispute Plaintiff's characterization of
Bartholomew's email correspondence, and maintain that CAIG's involvement in
the Atkins Search did not constitute a breach of the LPA.  (Def. MSJ Br. 15).
Such arguments, however, implicate factual disputes that cannot be resolved
at the summary judgment stage.  And resolving those disputes in Plaintiff's
favor for the purposes of this motion, sufficient evidence supports Plaintiff's
theories of misappropriation through both disclosure and use, insofar as the

use of the Atkins List by Bartholomew Advisors to complete the Atkins Search would violate the confidentiality and non-compete provisions of the LPA.  At trial, it will be for the jury to evaluate Bartholomew's testimony to determine if he was acting in good faith by communicating the details of the Atkins Search to Archer, and likewise for the jury to determine whether CAIG's actions in preparing the Atkins List using Catalyst resources constitutes a breach of the LPA sufficient to support a finding of misappropriation.

Moving to the Immatics List, however, the Court finds the factual record simply too thin to support a reasonable jury's finding that CAIG misappropriated the list.  As noted previously, misappropriation requires Plaintiff to demonstrate that "[CAIG] used [the Immatics List] in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *N. Atl. Instruments, Inc.*, 188 F.3d at 43-44.  Here, the undisputed facts provide that CAIG, through Bartholomew, took a physical copy of the Immatics List from the London office following the partners' meeting on or about October 21, 2019, and promptly returned the list on or about October 23, 2019.  (*See* Barson Depo. 133:18-134:10).  Bartholomew further avers in his testimony that he never used the Immatics List.  (Bartholomew Depo. 133:7-8 ("Q:  Did you ever use this list for Immatics?  A:  No.")).  No reasonable juror could, on these facts, conclude that Bartholomew's brief possession of the list after his dissociation was improper.  For one, CAIG's disavowal that it disclosed or otherwise used the list in the three days that it possessed the physical copy of the list belies any finding that CAIG used the

Immatics List in breach of the confidentiality agreements in the LPA or employee handbooks. (*See* LPA § 5.7). Nor, in this context, is the sole fact that CAIG prepared a printed version of the list sufficiently material to the question of whether the Immatics List was acquired by improper means, given its prompt return. (*See* Silverman MSJ Decl., Ex. 10). Accordingly, the Court will grant Defendants' motion for summary judgment on the issue of the Immatics List, but will allow Plaintiff to proceed to trial on CAIG's possession of the Atkins List.

Plaintiff has identified sufficient evidence that would allow a reasonable jury to conclude that Plaintiff possessed protected trade secrets in the form of the Catalyst IP, as well as the Atkins and Immatics Lists. As to Defendant Richards, Plaintiff has adduced sufficient circumstantial evidence that, construed in Plaintiff's favor, would support a reasonable inference that Richards misappropriated the Catalyst IP contained in the Invenias and SharePoint databases by exporting it from Plaintiff's systems to his own devices at or around the time of his dissociation from Catalyst. Separately, as to Defendant CAIG, Plaintiff has presented sufficient evidence to indicate that CAIG misappropriated the Atkins List through its use in connection with CAIG's completion of the Atkins Search as Bartholomew Advisors. Plaintiff has not, however, demonstrated that CAIG's brief retention of the Immatics List supports a finding of misappropriation. Therefore, the Court grants summary judgment as to Plaintiff's claims arising from the Immatics List, and denies summary judgment as to Plaintiff's claims arising from the Atkins List.

### 3. Triable Issues Remain as to Whether Defendants Breached the LPA

Turning finally to Plaintiff's breach of contract claims, Defendants argue that the evidence does not establish a triable issue that (i) CAIG breached § 5.6(a)(2) of the LPA by directly competing with Catalyst while a limited partner, or (ii) Richards breached § 5.6(a)(1) and (2) of the LPA by diverting Catalyst searches during his time as a limited partner.  (*See* Def. MSJ Br. 16-22).  The Court disagrees.

In relevant part, the LPA barred Defendants, while partners of Catalyst, from "directly or indirectly, ... (1) interfer[ing] with, divert[ing], or otherwise seek[ing] to terminate or cause to be terminated, the relationship of the company with any Company Customer; or (2) provid[ing] services to any person that provides services in competition with the services provided by the Company."  (Pl. Opp. 56.1 ¶ 35 (quoting LPA § 5.6(a))).  Beginning with Richards, Plaintiff maintains that his communications with Krystal Biotech while a limited partner at Catalyst are evidence of his diversion of at least one search prior to dissociating from Catalyst.  (Pl. Opp. 35).  The evidence, construed in Plaintiff's favor, reflects that on July 17, 2019, Richards sent a proposal letter for a chief business officer search to Krystal Biotech, and that on or about September 23, 2019, after already drafting his own letter of resignation from Catalyst, Richards drafted an email to Krystal Biotech indicating that it "might make sense to withdraw the proposal we have with you and we can always pick this up" at a later time.  (Pl. 56.1 ¶¶ 83-84 (quoting Matalon Decl., Ex. 6)).  Richards then departed Catalyst two weeks

later, on October 7, 2019, to begin employment at non-party Spencer Stuart, a competing executive search firm.  Thereafter, Krystal Biotech engaged Spencer Stuart on December 4, 2020, for a chief commercial officer search.  (Pl. 56.1 ¶ 86 (citing Matalon Decl., Ex. 7)).

Defendants maintain that Richards withdrew the Krystal Biotech business on Alyson Archer's instructions and did not handle the search at Spencer Stuart.  (*See* Richards Depo. 197:1-9).  However, the credibility of Richards's competing justification is not suitable for determination at summary judgment and must be assessed by the jury at trial.  *See Hayes*, 84 F.3d at 620 ("In applying [the summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses." (citing *United States* v. *Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).

Separately, it is undisputed that CAIG — and Simon Bartholomew — actually completed a search project for Atkins through Bartholomew Advisors while CAIG was still a limited partner at Catalyst.  On this topic, the parties dispute whether Catalyst had properly given Bartholomew its blessing to turn down the business, thereby allowing CAIG to pick up the search through Bartholomew Advisors, and relatedly, whether Bartholomew had misrepresented the details of the Atkins Search in order to make the search less appealing to Catalyst.  (*See* Def. Opp. 56.1 ¶ 101 (setting forth Plaintiff's and Defendants' competing positions on whether "CAIG created the pretext to argue Catalyst refused the search project after informing [the Managing Partner of Catalyst] that the total compensation Catalyst could have been paid on the

[Atkins] search project would have [been] a retainer of £60,000 with a potential total fee of '£80- £90k.'" (citing CAIG Depo. 67:20-70:19; Matalon Decl., Ex. 9))). Once again, however, "[t]hese [credibility] determinations are within the sole province of the jury." *Hayes*, 84 F.3d at 620 (citing *Azrielli* v. *Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994)).

Finally, Defendants argue that Plaintiff cannot establish damages as a result of either CAIG's or Richards's alleged breaches of the LPA. As to Richards, the Court finds that the alleged diversion of Krystal Biotech from Catalyst provides a sufficient basis on which Plaintiff can articulate damages arising from a breach of the LPA. Likewise, to the extent that the jury finds that Richards misappropriated certain documents comprising the Catalyst IP, the Barson Report provides adequate guideposts — in terms of the total amount expended by Catalyst relevant to the development and expansion of its database, and the per-entry cost of the constituent documents within the Catalyst IP — for a jury to arrive at an appropriate damages award. (*See* Barson Rep. 5 (concluding that "Catalyst expended $42,270,174 relevant to the development/expansion of [the] database [containing the Catalyst IP]," and that "each one of [the] 40,048 entries [within the database], ... cost Catalyst $1,055.49")).

Likewise, as to CAIG, the Barson Report provides a basis on which to evaluate the cost associated with the alleged misappropriation of the Atkins List. For example, Plaintiff's counsel may seek damages corresponding to the per-entry cost identified by Barson multiplied by the number of entries in the

Atkins List.  In terms of breaches to the LPA, the Court finds that Plaintiff has adduced sufficient facts to establish that it suffered damages with the diversion of the Atkins Search.

## C.  Defendants Have Not Met Their Burden to Prove That Catalyst's Claims Are Precluded

At the tail end of their opening and reply briefs, Defendants append an argument that Plaintiff's claims are precluded because they should have been brought as compulsory counterclaims in a separate action brought by Defendants against Plaintiff in Delaware Chancery Court.  (Def. MSJ Br. 22-25; Def. Reply 12).  *See Catalyst Advisors Investors Global Inc. and Christos Richards* v. *Catalyst Advisors, L.P.* (the "Delaware Action"), No. N20C-06-080 AML (Del. Sup. Ct.).  Consistent with well-established precedent, Defendants, as the "party seeking to invoke *res judicata* [bear the burden] to prove that the doctrine bars the second action."  *Computer Assocs. Int'l, Inc.* v. *Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997).  As discussed below, however, Defendants' conclusory invocation of *res judicata* comes up short.

When a party alleges that another has failed to raise a compulsory counterclaim in a state court proceeding, the court applies the compulsory counterclaim law of the state in which the proceeding was conducted. *Conopco, Inc.* v. *Roll Int'l*, 231 F.3d 82, 88 (2d Cir. 2000).  Accordingly, the Court turns to Delaware law, which dictates that a counterclaim is compulsory only if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the Court cannot acquire jurisdiction."  Del.

Super. Ct. Civ. R. 13(a).  Delaware courts have further clarified that whether a claim and counterclaim arise out of the same transaction or occurrence turns on "whether the two bear a 'logical relationship,'" which analysis is informed by "whether they share issues of fact and law in common or would involve presentation of the same evidence."  *Pontone* v. *Milso Indus. Corp.*, 100 A.3d 1023, 1056-57 (Del. Ch. 2014).

Here, however, Defendants support their argument with little in terms of specifics.  In particular, Defendants proffer three documents in support of their argument.  First, Defendants provide Catalyst's answer and affirmative defenses in the Delaware Action, the eighth affirmative defense of which alleges that "[CAIG and Richards] failed to perform in accordance with the terms and conditions of the parties' agreement(s) and [are] therefore not entitled to payment of the monies claimed herein."  (Silverman MSJ Decl., Ex. 22 at 19).  Next, Defendants provide email correspondence between the parties' counsel, in which counsel discuss the apparent initiation of the Delaware Action and counsel for Defendants writes:  "In the meantime, I did not get a response to my last email.  You were going to forward me a new valuation report and the relevant forensic report."  (*Id.*, Ex. 23 at 3).  Putting to the side Plaintiff's objection that the emails reflect confidential settlement discussions (Pl. Opp. 37 & n.4), Defendants' invocation of a passing reference in a single email chain is too slender a reed to support Defendants' broad argument that the two sets of claims "share issues of fact and law in common" such that preclusion would apply.

More to the point, any significance of these first two documents is decidedly undercut by the third document provided by Defendants, which appears to be the entire 1,270-page trial transcript for the Delaware Action. (Silverman MSJ Decl., Ex. 21).  Here, as Plaintiff properly notes, the trial transcript reflects that Judge LeGrow, the Delaware trial judge, "expressly decoupled the separate and distinct issues the two litigations presented."  (Pl. MSJ Opp. 37 (citing Silverman MSJ Decl., Ex. 21 at 142:5-142:9, 603:11-603:23, 623:15-623:4))  As Judge LeGrow made clear, the "[Delaware] Court is not going to tread on the issues before the New York Court," finding, in particular, that "[she was] not aware of a[n] affirmative defense [of anticipatory breach by Richards and CAIG] even being pleaded in that respect."  (Silverman MSJ Decl., Ex. 21 at 603:11-17).  Indeed, this distinction was duly acknowledged by counsel for Defendants, who objected at trial in the Delaware Action to questions regarding the confidentiality of partners' meetings, arguing that "[t]here is another case in New York and I fear that these line of questioning is more appropriate for the case in New York for getting into whether or not this is [] confidential ….  It's not relevant to the dispute in Delaware."  (*Id.* at 140:9-16).  For their part, Defendants reference the entire trial transcript only once, in their opening brief in support of their motion for summary judgment, and in their reply do not even engage with Plaintiff's citations to the trial record.  Accordingly, the Court finds that Defendants have come up far short of their burden to establish that the claims in this action are precluded by the adjudication of the Delaware Action.

## CONCLUSION

For the reasons enumerated herein, Defendants' motions *in limine* are DENIED, and Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Clerk of Court is directed to terminate the pending motions at docket numbers 74 and 87.

The parties are hereby ORDERED to submit a joint letter addressing next steps in this case — including, as appropriate, the parties' availability for trial in the second and third quarters of 2024 and/or their interest in referral to the assigned Magistrate Judge or the Court's mediation program — on or before **March 1, 2024**.

SO ORDERED.

Dated:   February 9, 2024
         New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

73